JAMES MOYER AND SHARON MOYER, APPELLEES, V.
NEBRASKA CITY AIRPORT AUTHORITY, APPELLANT.

655 N.W.2d 855

Filed January 24, 2003. No. S-01-1131.

Richard H. Hoch and Jeffrey J. Funke, of Hoch, Funke & Kelch, for appellant.

John W. Voelker for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

In 1991, as part of a plan to build a new airport, the Nebraska City Airport Authority (Airport Authority) condemned a portion of farmland owned by James Moyer and Sharon Moyer. A jury awarded the Moyers $82,748. In 1999, the Moyers brought this inverse condemnation action, alleging that in both the initial construction and the subsequent construction of a runway extension, the Airport Authority obstructed and altered existing drainways. The Moyers alleged that improper construction and operation resulted in significant erosion damage to their remaining property. A jury awarded the Moyers $16,400 in damages, and the Airport Authority appealed.

In this appeal, we determine if the present inverse condemnation action is barred by res judicata because of the prior condemnation. Because we determine that the Moyers are seeking to recover for damages caused by improper construction or operation not contemplated in the prior condemnation, res judicata does not apply. We also determine that the Moyers presented sufficient evidence to establish improper construction or operation. We affirm.

## BACKGROUND

The Airport Authority condemned a portion of a quarter section of farmland owned by the Moyers. The Airport Authority sought 23.1 acres in fee and an aviation easement. A jury entered an award in the amount of $82,748, including severance damages. The land condemned lies to the north of the remaining Moyer property.

After taking the Moyer property, the Airport Authority began construction on the new airport. The engineers devised a drainage scheme to remove diffused surface water from the airport property. The original design called for drainage channels to be constructed. These channels were to take water to two diversion terraces which would in turn take the water to a natural drainway. This natural drainway cuts across both the Airport Authority property and the Moyer property. After the drainway enters the Moyer property from the north, it carries water diagonally from the northwest to the southeast.

In the original plan, one diversion terrace was to wrap around the southeast end of the runway and take water to the north where it was to be deposited into the natural drainway just before the drainway entered the Moyer property. The other diversion terrace was to carry water to the east and deposit it into the drainway just before the drainway left the Moyer property.

After construction began, James Moyer expressed concern to the Airport Authority that the drainage design would result in damage to his property, but he denied requesting any specific design changes. At some point after this discussion, the drainage scheme was altered. Instead of using the two-diversion terrace design, the Airport Authority implemented a one-diversion terrace design. After draining from the airport, water was taken to the diversion terrace. The diversion terrace began on the east side of the airport. It then wrapped around the south side of the runway, directing water back to the northwest. After it turned to the northwest, the diversion terrace ran between the Moyer property and the runway. Eventually, the diversion terrace emptied into the natural drainway.

As built in the original construction, the diversion terrace meets the natural drainway about 150 feet north of the Moyer property line. In total, 248 acres drain into the natural drainway. Of this total, 36.8 acres drain into the drainway as a result of the diversion terrace.

In 1999, the Airport Authority extended the airport runway. As part of the project, the Airport Authority made the diversion terrace longer, raised its height from 1½ to 3 feet, and widened its bottom.

In October 1999, the Moyers filed an inverse condemnation action under Neb. Rev. Stat. § 76-706 (Reissue 1996) for the appointment of appraisers with the Otoe County Court. The appraisers determined that the Moyers had suffered no damages, and the Moyers appealed to the district court. In their petition on appeal, they claimed that construction at the airport had obstructed and altered existing drainways, resulting in damage to their property. At the pretrial conference, the Moyers were allowed to amend their petition to claim damages that resulted from both the original construction and the construction of the extended runway.

The Airport Authority filed a motion for summary judgment, asserting that as a result of the previous condemnation proceeding, the inverse condemnation action was barred by res judicata. The district court denied the motion, reasoning that the initial condemnation action "did not include possible damage to the remainder as a result of claimed additional damage resulting from the use of the property that had been condemned by the Airport Authority."

At trial, the Moyers claimed that because of the Airport Authority's construction and operation of the airport, they had suffered two distinct types of damages. First, the Moyers argued that the drainage scheme dumps too much water at too high of a rate into the natural drainway that runs through their property, causing erosion to the drainway. The civil engineer called by the Moyers, Ronald E. Ross, described how the airport has changed the manner in which surface water reaches the natural drainway. Ross testified that the airport construction increased the number of acres draining into the natural drainway by a net of only 2 acres. But, because the airport runways, parking lots, and drainage systems accelerate the velocity at which diffused surface water drains, twice as much water reaches the drainway as previously did. Ross also testified that the diversion terrace has changed where diffused surface water enters into the drainway. As a result, the number of acres that drain into the drainway *before* it reaches the Moyer property has doubled, increasing the volume of water flowing through the drainway as it crosses the Moyer property. Ross also testified that the drainage scheme

used by the airport increased the velocity at which water enters into and flows through the natural drainway.

Ross opined that the increased volume and velocity of water entering into the natural drainway is eroding the drainway. He described cost-efficient methods that the airport could have used to reduce both the volume and the velocity of the surface water entering into the natural drainway.

James Moyer and his son testified that since the construction of the airport, the natural drainway has eroded and that the amount of water in the drainway has increased. Before the airport was constructed, they were able to cross the natural drainway with farming equipment, but now that is impossible. The record shows that the erosion of the natural drainway has worsened since the extension project and will continue to worsen. The Moyers' appraiser testified that the inability to cross the natural drainway has devalued the Moyer property.

The Moyers' second argument, that the airport construction has damaged their property, focused on erosion damage that their fields have suffered since the airport's construction. According to the Moyers, the redesigned diversion terrace does not operate as planned. As a result, water breaches and overflows the terrace during moderate and heavy rainfalls. This water then flows onto the Moyer property, eroding fields that lie south of the airport. Evidence showed that this erosion has worsened since the runway extension project and that it will continue to worsen.

To support their contention about the diversion terrace, the Moyers presented evidence from both Ross and Brian D. Dorsey, a construction manager. Dorsey testified that erosion was present on the diversion terrace itself and on the Moyer fields south of the diversion terrace. He opined that the erosion on the Moyer property resulted from diffused surface water draining from the airport, but the court refused to allow Dorsey to testify whether he believed the construction and design of the drainage scheme were negligently done. Ross testified that the diversion terrace is eroding and that it has breached during heavy rains. He opined that the erosion of both the terrace and the fields will continue.

Both Charles E. Swanson, the engineer who planned the drainage scheme for the initial construction, and Alois Hotovy,

the engineer who planned the runway extension, testified for the Airport Authority. Both claimed that the drainage system they had developed was properly designed and constructed. Contradicting Swanson's testimony, however, Hotovy testified that the original diversion terrace suffered from problems—in particular, an inability to handle large rainfall—resulting in minor erosion to the Moyer property. Moreover, Swanson admitted that if the diversion terrace was operating as designed, it would not be eroded to the extent suggested by the evidence presented by the Moyers.

The Airport Authority moved for directed verdict both at the close of the Moyers' case in chief and at the end of all the evidence. In both motions, it asserted that res judicata barred the Moyers' action. It also argued that because of the earlier condemnation action, the Moyers were required to show improper construction or operation of the airport, and that they had failed to do so. The court overruled both motions.

At the jury instruction hearing, the Moyers requested that the jury be given an instruction concerning whether the Airport Authority had violated water laws. The Airport Authority objected, and the trial judge refused to give the instruction. The jury returned a $16,400 verdict for the Moyers. The court overruled the Airport Authority's motions for a new trial and for judgment notwithstanding the verdict. The Airport Authority appealed.

## ASSIGNMENTS OF ERROR

The Airport Authority assigns, restated, that the district court erred in not (1) sustaining the motion for summary judgment and directed verdict because the Moyers' inverse condemnation action was barred by res judicata, (2) directing a verdict because the Moyers failed to show improper construction or operation of the airport, and (3) sustaining the motions for a new trial and for judgment notwithstanding the verdict because the verdict was not sustained by the law or the evidence.

## STANDARD OF REVIEW

A denial of a motion for summary judgment is not a final order and therefore is not appealable. *McLain v. Ortmeier*, 259 Neb. 750, 612 N.W.2d 217 (2000).

■ When a motion for directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law. *Jay v. Moog Automotive*, 264 Neb. 875, 652 N.W.2d 872 (2002).

■ To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Eyl v. Ciba-Geigy Corp.*, 264 Neb. 582, 650 N.W.2d 744 (2002).

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Bowley v. W.S.A., Inc.*, 264 Neb. 6, 645 N.W.2d 512 (2002).

## ANALYSIS

### MOTION FOR SUMMARY JUDGMENT

■ The Airport Authority assigns as error the district court's denial of its motion for summary judgment.

A denial of a motion for summary judgment is an interlocutory order, not a final order, and therefore not appealable. . . .

The denial of a summary judgment motion is neither appealable nor reviewable. Whether a denial of summary judgment should have been granted generally becomes moot after a full trial on the merits. . . . The overruling of a motion for summary judgment does not decide any issue of fact or proposition of law affecting the subject matter of the litigation, but merely indicates that the court was not convinced by the record that there was not a genuine issue as to any material fact or that the party offering the motion was entitled to a judgment as a matter of law. . . . After trial, the merits should be judged in relation to the fully developed record, not whether a different judgment may have been warranted on the record at summary judgment.

(Citation omitted.) *McLain v. Ortmeier*, 259 Neb. at 754-55, 612 N.W.2d at 222. Accordingly, we do not consider whether

the court erred in not granting the Airport Authority summary judgment.

## RES JUDICATA

■■■ Initially, we must determine if res judicata bars the Moyers' current action. The applicability of the doctrines of collateral estoppel and res judicata is a question of law. *McCarson v. McCarson*, 263 Neb. 534, 641 N.W.2d 62 (2002). On several occasions, we have addressed the preclusive effects of a condemnation award on a subsequent eminent domain action that seeks to recover for damages done to the remainder property by the original condemnor. See, e.g., *Hansen v. County of Cass*, 185 Neb. 565, 177 N.W.2d 568 (1970); *Clary v. State*, 171 Neb. 691, 107 N.W.2d 429 (1961); *Snyder v. Platte Valley Public Power and Irrigation District*, 140 Neb. 897, 2 N.W.2d 327 (1942); *Psota v. Sherman County*, 124 Neb. 154, 245 N.W. 405 (1932); *Bunting v. Oak Creek Drainage District*, 99 Neb. 843, 157 N.W. 1028 (1916). In *Hansen v. County of Cass*, 185 Neb. at 567, 177 N.W.2d at 569, we explained:

> In an eminent domain proceeding the principle of just compensation for damage to the remainder excludes conjectural items. Yet for all damage to the remainder on account of proper construction or operation the landowner must obtain compensation in the first proceeding. . . . The final condemnation award is conclusive both on questions actually litigated and on questions necessarily within the issues. It is not conclusive in a subsequent action as to remainder damage that was caused by improper construction or operation and that was not actually litigated in the first proceeding. Liability rests upon the original taking or damaging for public use. Recovery is permitted because the new element was not contemplated or determined at the time of the taking or damaging.

(Citations omitted.) Here, the Moyers claim that as a result of improper construction or operation at the airport, they have suffered erosion damage. The Airport Authority argues that the erosion damage suffered by the Moyers could have been contemplated and determined at the time of the original taking. We disagree.

In a condemnation action, there are two elements of damage: (1) market value of the land taken or appropriated and (2) diminution in value of the land remaining, less special benefits. *Sorensen v. Lower Niobrara Nat. Resources Dist.*, 221 Neb. 180, 376 N.W.2d 539 (1985) (superseded by statute on other grounds). Damages recoverable in a condemnation case are determined by the extent of the taking and a condemnor's rights actually acquired, not by a condemnor's use resulting from less than full exercise of a right acquired by eminent domain. *Id.* A condemnee, however, cannot recover uncertain, conjectural, or speculative damages. *Enterprise Co., Inc. v. Sanitary Dist. No. One*, 176 Neb. 271, 125 N.W.2d 712 (1964). Thus, res judicata bars a subsequent inverse condemnation action which seeks to recover for damages to remainder property which would not have been speculative in the original condemnation action. But when the remainder property actually suffers damages that would have been too speculative to recover in the original condemnation proceedings, the condemnee is not barred from recovering for them in a later inverse condemnation action.

In the past, we have been clear that a condemnee is required to anticipate in the original proceedings that the condemnor's contemplated use will alter drainage patterns. See *Snyder v. Platte Valley Public Power and Irrigation District, supra.* Thus, any damages that the condemnee will suffer as a result of a properly constructed and operated drainage scheme are not too speculative to recover in the original condemnation proceedings. *Psota v. Sherman County*, 124 Neb. at 157, 245 N.W. at 406 (holding that in original proceeding, condemnee is entitled to all damages which would result from "proper construction, improvement, and maintenance . . . taking into consideration such embankments, cuts, bridges, culverts, and ditches as shall be required . . . for the purpose of a proper construction and maintenance"). Moreover, if a design flaw exists in the drainage scheme planned at the time of the original condemnation proceedings, the flaw is not too speculative to litigate. As a result, the condemnee is charged with any damages that result from a design flaw existing in the drainage scheme at the time of the original condemnation proceedings. See *Snyder v. Platte Valley Public Power and Irrigation District*, 140 Neb. 897, 2 N.W.2d 327 (1942).

But, in the original condemnation proceedings, the possibility that the condemnor will not use the proper level of skill in building a well-designed drainage scheme is too speculative to allow recovery. As a result, once damage occurs, recovery can be had in a subsequent action. *Bunting v. Oak Creek Drainage District*, 99 Neb. 843, 157 N.W. 1028 (1916). Similarly, the possibility that the condemnor will abandon its planned drainage scheme and adopt a new, flawed one is too remote to allow recovery in the original proceedings. Thus, if after the condemnation proceedings, the condemnor adopts a new drainage scheme which negligently endangers the condemnee's property, the condemnee is not barred from seeking damages.

Here, the Moyers sought two types of damages. First, they claimed that the drainage scheme used by the airport dumps too much water at too great a velocity into the drainway that crosses their land. The record shows that the Airport Authority changed its drainage scheme after construction began on the project. The Moyers complain that this new scheme was negligently designed. In the original condemnation hearing, the Moyers could not have recovered damages for the mere possibility that the Airport Authority would not use the drainage scheme it had and adopt a new, flawed one. Res judicata did not bar the Moyers from attempting to prove that the improper design of the new drainage scheme caused them damage.

For their second category of damages, the Moyers complain that the diversion terrace does not operate as designed. Once again, it would have been too speculative at the time of the original proceedings to allow the Moyers to recover for the possibility that the Airport Authority would not build its drainage scheme in a skillful manner. Res judicata does not prevent the Moyers from attempting to show that the diversion terrace was improperly constructed.

### IMPROPER CONSTRUCTION OR OPERATION

Even though res judicata does not bar the Moyers' inverse condemnation action, the Moyers were still required to prove that their damages resulted from the Airport Authority's improper construction or operation of the airport. See *Clary v. State*, 171 Neb. 691, 107 N.W.2d 429 (1961). The Airport Authority argues

that because the Moyers failed to present any evidence of improper construction or operation, the court erred when it denied the Airport Authority's motions for directed verdict, judgment notwithstanding the verdict, and a new trial.

Initially, the Airport Authority argues that to show improper construction or operation of the airport, the Moyers had to show that the Airport Authority violated the law governing diffused surface water. However, the Airport Authority's theory is inconsistent with the position it took at trial. When the Moyers requested a jury instruction on the law governing diffused surface waters, the Airport Authority objected that the instruction was irrelevant. The trial court agreed with the Airport Authority, and no instruction on diffused surface water was given.

Generally, a party cannot complain of error which the party has invited the court to commit. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). Moreover, " '[w]hen a theory on any issue is relied upon by a party at the trial as the proper one, it will be adhered to on appeal without regard to its correctness.' " *Ballantyne v. Parriott*, 172 Neb. 215, 217, 109 N.W.2d 164, 165 (1961). Accordingly, in determining whether the Airport Authority improperly constructed or operated the airport's drainage scheme, we do not consider the law governing diffused surface water.

On the redesign of the drainage scheme, it is undisputed that the Airport Authority used the diversion terrace to redirect where diffused surface water entered the drainway. The Moyers' expert testified that the original airport construction and the subsequent runway extension substantially increased the velocity and volume of water flowing through the drainway as it crossed the Moyers' property. This caused erosion to the drainway. According to the Moyer's expert, cost-efficient engineering techniques were available which would have reduced both the volume and velocity of water entering into the natural drainway and thereby reducing the erosion damage to the drainway. The Airport Authority, however, failed to implement these techniques.

For the construction of the diversion terrace, the record shows that the diversion terrace could not adequately handle all the water it was designed to carry. Evidence suggested that the diversion terrace was not as high as designed in places and that

during heavy rainfalls, the terrace would breach. Moreover, the Moyers presented extensive evidence showing the diversion terrace itself was eroding, and the engineer who redesigned the drainage scheme during the initial construction admitted that if the diversion terrace was operating as designed, this erosion would not be present.

The question of improper construction or operation is a factual one to be determined by the jury. See *Robinson v. Central Neb. Public Power & Irrigation District*, 146 Neb. 534, 20 N.W.2d 509 (1945). We would not characterize the evidence of improper construction and operation offered by the Moyers as overwhelming, and we recognize that the Airport Authority presented conflicting evidence. But it was for the jury, as trier of the facts, to resolve conflicts in the evidence and to determine the weight and credibility to be given to the testimony of the witnesses. *Beauford v. Father Flanagan's Boys' Home*, 241 Neb. 16, 486 N.W.2d 854 (1992). Based on the totality of the evidence presented at trial, reasonable minds could have reached the conclusion that the erosion damage suffered by the Moyers resulted from improper construction or operation. Accordingly, the Airport Authority was not entitled to a directed verdict or to judgment notwithstanding the verdict.

Moreover, we cannot say the jury's determination was "so clearly against the weight and reasonableness of the evidence and so disproportionate to the injury proved as to demonstrate that it was the result of passion, prejudice, mistake, or some other means not apparent in the record, or that the jury disregarded the evidence or rules of law." See *id.* at 20, 486 N.W.2d at 857. The district court did not abuse its discretion in denying the Airport Authority a new trial.

## CONCLUSION

The Moyers' inverse condemnation action was not barred by res judicata, and the Moyers presented sufficient evidence of improper construction or operation by the Airport Authority to withstand the Airport Authority's motions for directed verdict, judgment notwithstanding the verdict, and a new trial. Accordingly, we affirm.

AFFIRMED.