KAREN CARLSON AND C. DEAN CARLSON, APPELLEES, V.
LESLIE A. OKERSTROM AND K & B TRANSPORTATION, INC.,
A NEBRASKA CORPORATION, APPELLANTS.

675 N.W.2d 89

Filed February 13, 2004.   No. S-02-1076.

Gerald L. Friedrichsen and Susan E. Hager, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., L.L.O., for appellants.

Bernard J. Glaser, Jr., for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

A jury awarded C. Dean Carlson (Dean) $894,901 and his wife, Karen Carlson, $259,578 for injuries they suffered because of an automobile collision caused by the negligence of Leslie A. Okerstrom.

On appeal, Okerstrom and his employer, K & B Transportation, Inc. (collectively the appellants), claim that the court erred in allowing the Carlsons' expert, Daniel B. Einspahr, M.D., to testify that Dean developed a dysfunctional bladder because of injuries he suffered in the collision. Specifically, the appellants argue that (1) because Einspahr was an internist and not a urologist or neurologist, he was not qualified to testify as an expert on Dean's bladder condition, and (2) the basis for his opinion was unreliable. The appellants also contend that they were entitled to a partial directed verdict and that the jury verdicts were excessive.

We determine that the trial court did not err in finding that Einspahr was qualified to testify and that Einspahr's opinion had a reliable basis. In addition, we reject the appellants' claims that they were entitled to a partial directed verdict and that the verdicts were excessive. Affirmed.

## I. BACKGROUND

The collision occurred in Fillmore County, Nebraska, on March 24, 1996. The Carlsons were in their van northbound on

U.S. Highway 81; Dean was driving, and Karen was in the passenger seat. A Nebraska Department of Roads' gravel truck was stopped in the southbound lane, waiting to turn left into a facility operated by the Department of Roads. Okerstrom, who was driving a semitruck trailer for K & B Transportation (hereinafter K & B), collided with the back of the gravel truck. The collision propelled the gravel truck into the northbound lane where it collided with the Carlsons' van.

The Carlsons alleged that Okerstrom's negligence caused the collision and that K & B was vicariously liable for Okerstrom's negligence. Dean alleged that because of the collision, he had suffered loss of peripheral vision in his right eye, loss of bladder control, impotency, headaches, chronic pain, psychological trauma, and physiological contusions and trauma. Karen alleged that because of the collision, she had suffered an acute cervical strain, headaches, psychological trauma, and physiological contusions and trauma. Both Dean and Karen also made loss of consortium claims. At the time of the collision, Dean was 55 and Karen was 53. The details of the injuries that the Carlsons allege they suffered are discussed at length in the analysis portion of our opinion.

Before trial, K & B admitted that Okerstrom was its agent and both Okerstrom and K & B admitted that Okerstrom's negligence had caused the collision. Thus, the issues at trial were (1) whether the collision had caused the injuries alleged by Karen and Dean and (2) the extent of those injuries.

One of the main disputes between the parties was whether trauma suffered in the collision caused Dean to lose the ability to void his bladder. To prove the causal connection of his bladder condition to the collision, Dean relied on the expert testimony of Einspahr. Before trial, the appellants filed a motion in limine to prevent Einspahr from testifying that the collision had caused Dean's bladder injury. Relying on Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995), they argued that (1) Einspahr was not qualified to testify on the causation issue because he was not a specialist in urology and (2) the methodology Einspahr had employed in reaching his opinion was not reliable under the standards we adopted in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (adopting standards set forth in *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and its progeny).

After conducting a *Daubert* hearing, the court overruled the motion. The appellants renewed their objection at trial, during Einspahr's testimony. The court also overruled the renewed objection.

The appellants did not present any evidence during the trial. When the Carlsons rested, the appellants moved for a directed verdict. To support the motion, the appellants noted that in addition to Einspahr's testimony, the Carlsons had also presented the deposition testimony of Ajay K. Singla, M.D., who testified that the cause of Dean's bladder condition was unclear. The appellants argued that because the Carlsons had offered conflicting opinions on whether the collision was the cause of Dean's bladder condition, the appellants were entitled to a directed verdict on that issue. The court denied the motion and allowed the case to proceed to the jury.

The jury returned general verdicts for Dean and Karen. It awarded Dean $894,901 for his damages and Karen $259,578 for her damages. The appellants moved for judgment notwithstanding the verdicts or in the alternative for a new trial. The motion was based on several grounds, including the failure to exclude Einspahr's testimony, the court's decision overruling the motion for a partial directed verdict, and the excessiveness of the verdicts. The court denied the motion. We granted the appellants' petition to bypass.

## II. ASSIGNMENTS OF ERROR

The appellants assign that the district court erred in (1) admitting into evidence Einspahr's testimony that the collision caused Dean's bladder condition, because the testimony failed to meet the standards announced in *Schafersman v. Agland Coop, supra*; (2) overruling their motions for partial directed verdict and for judgment notwithstanding the verdict; and (3) concluding that the jury verdicts were not excessive.

## III. STANDARD OF REVIEW

■ A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Perry Lumber Co. v.*

*Durable Servs.*, 266 Neb. 517, 667 N.W.2d 194 (2003); *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003).

A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Perry Lumber Co. v. Durable Servs., supra.*

When a motion for directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law. *McClure v. Forsman*, 266 Neb. 90, 662 N.W.2d 566 (2003).

To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Moyer v. Nebraska City Airport Auth.*, 265 Neb. 201, 655 N.W.2d 855 (2003).

The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Bradley T. & Donna T. v. Central Catholic High Sch.*, 264 Neb. 951, 653 N.W.2d 813 (2002).

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Perry Lumber Co. v. Durable Servs., supra.*

## IV. ANALYSIS

### 1. ADMISSIBILITY OF EINSPAHR'S CAUSATION OPINION

Since the collision, Dean's bladder has become dysfunctional; he can no longer void it without the assistance of a catheter. Dean alleges that injuries he sustained in the collision led to his bladder condition. To establish this causal connection at trial, he relied on the expert testimony of Einspahr. In their first assignment of error, the appellants assert that the trial court erred in allowing Einspahr to testify.

Rule 702 governs the admissibility of expert testimony. It provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Here, the appellants essentially make three arguments: the court (1) committed clear error in determining that Einspahr was qualified to testify as an expert on whether the collision had caused Dean's bladder condition; (2) abused its discretion in concluding that the differential diagnosis conducted by Einspahr was reliable under the standards we set out in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (adopting standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and its progeny); and (3) abused its discretion in allowing Einspahr to testify because on cross-examination, he conceded that his opinion was based on speculation.

We begin our analysis by describing Dean's bladder condition and how Einspahr reached his opinion. We then turn to the arguments made by the appellants.

### (a) Dean's Bladder Condition and Einspahr's Analysis

#### (i) Basic Operation of Bladder

The bladder is part of the urinary system; its purpose is to store urine until it is voided from the body. In a functional urinary system, the distal sphincter muscle controls when urine exits the bladder. Once the bladder is full, nerve fibers in the bladder are triggered. These nerve fibers meet with other nerve fibers serving other parts of the body to form a nerve, i.e., "[a] bundle of nerve fibers." Taber's Cyclopedic Medical Dictionary 1280 (18th ed. 1997). The message that the bladder is full is transmitted along this nerve to the spinal cord and then to the brain. When the individual decides to act on the sensation that the bladder is full, the brain sends a message to the distal sphincter muscle telling it to relax. The muscles surrounding the bladder then contract and force the stored urine into the urethra and out of the body.

*(ii) Symptoms Following Collision and*
*Subsequent Medical Examinations*

Dean's abdomen collided with the steering wheel, and his head hit the windshield, but he did not notice any injuries or pain immediately following the collision. An ambulance arrived and took him and Karen to the hospital. A physician at the hospital closed Dean's head wound with stitches. The hospital report states that there was "no indication of chest or blunt abdominal trauma" and that Dean denied "any aches or pains of his extremities." At trial, however, Dean testified that the physician "stitched up" his eye, but did not perform any further physical examinations.

Dean and Karen were released from the hospital on the day of the collision. That evening, Dean did not experience any pain or bruising. However, both he and Karen noticed that his penis was swollen. The next morning, Dean developed a large bruise just below his navel; he claims that the bruise lasted for about 2 weeks and was accompanied by internal aching. After the bruise was gone, the aching continued for over 1 year.

Dean testified that 3 to 4 weeks after the collision, he began to experience difficulty voiding his bladder. He explained that he would experience "a lot of pressure" in his bladder, but that when he attempted to urinate, he would be able to only partially void it. Dean claims that he told this to his son, who is a physician. Because Dean's son is uncomfortable treating family members, he recommended Dean to another physician. Dean, however, did not see a physician at that time. When asked why he did not take his son's advice, he testified, "I just felt it was going to go away."

Dean's bladder condition did not improve. Instead, it worsened to the point when he was completely unable to urinate. In June 1996, about 3 months after the collision, he saw a general practitioner, who referred him to a urologist, Don L. Henslee, M.D. Although Henslee did not testify at trial and his medical records were not offered into evidence, Einspahr, who relied on Henslee's reports, testified about Henslee's findings.

Henslee attempted to determine why Dean was unable to urinate. Many potential reasons exist why a person might develop the inability to void his or her bladder, including obstruction in the

urinary tract, prostatic enlargement, and infection. Additionally, a dysfunction in the nervous system serving the bladder, generically referred to as "neurogenic bladder," can cause the inability to void. Henslee found that there was no obstruction in Dean's urinary tract system and that his prostate was not enlarged. He eventually diagnosed Dean with neurogenic bladder.

As noted, however, neurogenic bladder is a generic term. It covers a broad range of problems with the nervous system serving the bladder, including injury to the individual nerve fibers that serve the bladder, injury to the nerve that those nerve fibers run in, injury to or disease of the spinal cord, and injury to or disease of the brain. In addition, neurogenic bladder can be idiopathic or, in other words, without a recognizable origin. Taber's Cyclopedic Medical Dictionary 960 (18th ed. 1997). Henslee was unable to determine what specifically was wrong with the nervous system serving Dean's bladder. Nor was he able to determine whether the accident or some other agent had caused Dean to develop neurogenic bladder.

To pinpoint the problem with Dean's nervous system, Henslee referred him to a neurologist, Gary L. Pattee, M.D. Pattee did not testify, and his medical records were not introduced into evidence. According to Dean and Einspahr, who relied on Pattee's reports, Pattee conducted several tests on Dean, including a spinal tap and an MRI. Pattee's testing was unable to find any damage or disease to Dean's nervous system. Specifically, he determined that Dean did not have multiple sclerosis, a tumor affecting the nervous system, or an injury to the spinal cord. But according to Einspahr, Pattee's findings did not mean that the nervous system serving Dean's bladder was functioning properly. Einspahr testified that it meant that the injury was most likely to a portion of the nervous system that was not capable of being tested.

At the time he saw Pattee, Dean was having intermittent fevers. Pattee was concerned that these fevers indicated that an infection had caused Dean's bladder condition, and he referred Dean to Einspahr, who specializes in internal medicine. Einspahr explained that he focuses on common complex medical problems that occur in adult patients. He first saw Dean in February or March 1997. After examining him, Einspahr ruled out infection as the cause of the bladder condition. But at that

time, he did not express an opinion about what was wrong with Dean's bladder or what agent or event had caused Dean to develop his bladder condition.

Dean saw several other physicians over the course of the next 4 years. He visited the Mayo Clinic to get the opinion of a specialist in urology. He also sought the opinion of Singla, a urologist, who at the time was practicing in Omaha, and Jack W. McAninch, M.D., a trauma urologist in California. These physicians could not pinpoint where Dean's nervous system was malfunctioning, nor could they determine what had caused it to malfunction. In fact, McAninch, who did not testify at trial, concluded that Dean was not suffering from neurogenic bladder. Instead, he believed that an enlarged prostate had caused Dean's bladder retention and that surgery could rectify the problem.

### (iii) Einspahr's Opinion on Causation

To prove the causal connection between his bladder condition and the collision, Dean relied on the testimony of Einspahr. As noted, Einspahr is not a urologist. Rather, he is a specialist in internal medicine. He has no training in urology other than what was required while he was in medical school. Einspahr, however, testified that Dean's urological symptoms include the types of symptoms he would evaluate during the ordinary course of his practice as an internist.

As discussed earlier, Einspahr originally expressed no opinion as to the cause of Dean's bladder condition; he only ruled out the possibility that infection was the cause. But in the summer of 2000, Einspahr, at the request of Dean and his counsel, reevaluated Dean. After this reevaluation, Einspahr came to the conclusion that the collision had caused Dean to develop the neurogenic bladder condition. At trial, he testified to this to a reasonable degree of medical certainty.

Einspahr based his conclusion that the collision had caused Dean to develop neurogenic bladder on the results of a differential diagnosis. Within the medical community, "differential diagnosis" appears to be a generic term, which is used to refer to a variety of diagnostic techniques. See, generally, Jerome P. Kassirer & Richard I. Kopelman, Learning Clinical Reasoning 112-14 (Williams & Wilkins 1991) (commenting on

"fuzzy and incomplete" concept and outlining five forms of differential diagnosis). But within the legal world, an entire subset of case law evaluating the reliability of the differential diagnosis technique has developed. Generally, these courts explain that "[i]n performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the [patient's] injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." *Glastetter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). See, also, *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). This is consistent with the technique that Einspahr employed, and it is the meaning of differential diagnosis that we will use in the remainder of our discussion.

As noted earlier, there are several potential causes for bladder retention. These include obstruction in the urinary tract, enlarged prostate, and infection. In addition, bladder retention can be caused by those conditions that fall under the general rubric of neurogenic bladder: (1) injury to the individual nerve fibers that serve the bladder, (2) injury to the nerve that those nerve fibers run in, (3) injury to or disease of the spinal cord, (4) injury to or disease of the brain, and (5) idiopathic neurogenic bladder. In conducting his differential diagnosis, Einspahr considered each of these possibilities.

Einspahr then considered the "ruling out" portion of his analysis. Based on the reports of Henslee and Pattee, Einspahr was able to rule out obstructions to the urinary tract, multiple sclerosis, injury to the spinal cord, and tumors in the spinal cord as possible causes for Dean's condition. In addition, his own examination of Dean had ruled out infection as the cause of Dean's bladder retention.

After Dean saw McAninch, Einspahr reexamined Dean and found, as McAninch had, that Dean's prostate was now enlarged enough to cause bladder retention. But Einspahr did not believe that this fully explained Dean's condition. He noted that a prostate examination done by him in 2000 as well as Henslee's initial examination and the examination done at the Mayo Clinic had shown that Dean did not have an enlarged prostate. From this, he concluded that Dean had not developed an enlarged prostate until 4 years after his bladder retention problems had begun. Thus, it

was Einspahr's opinion that two independent conditions were causing Dean's bladder retention: prostatic enlargement and neurogenic bladder. According to Einspahr, even if the enlarged prostate were operated on, Dean's bladder would still not function properly because of the neurogenic bladder condition.

At this point in his analysis, Einspahr was left with two possible explanations for what had caused Dean to develop neurogenic bladder: (1) the collision caused trauma that injured the nervous system serving Dean's bladder or (2) he had idiopathic neurogenic bladder. Relying on the fact that Dean developed the bladder condition within weeks of the collision, Einspahr concluded that the collision was the more likely explanation for Dean's neurogenic bladder.

(b) Qualification

Under rule 702, a witness can testify concerning scientific, technical, or other specialized knowledge only if the witness is qualified as an expert. Whether a witness is qualified as an expert is a preliminary question for the trial court. *State v. Duncan*, 265 Neb. 406, 657 N.W.2d 620 (2003). A trial court is allowed discretion in determining whether a witness is qualified to testify as an expert, and unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal. *Id.*

In arguing that the court committed error in determining that Einspahr was qualified to testify, the appellants focus on the fact that Einspahr does not specialize in either urology or neurology. However,

> [t]estimony of qualified medical doctors cannot be excluded simply because they are not specialists in a particular school of medical practice. . . . Instead, experts or skilled witnesses will be considered qualified if, and only if, they possess special skill or knowledge respecting the subject matter involved so superior to that of persons in general as to make the expert's formation of a judgment a fact of probative value.

(Citation omitted.) *Ashby v. First Data Resources*, 242 Neb. 529, 535, 497 N.W.2d 330, 335-36 (1993). See, also, *Mitchell v. U.S.*, 141 F.3d 8 (1st Cir. 1998); *Holbrook v. Lykes Bros. S.S. Co., Inc.*,

80 F.3d 777 (3d Cir. 1996); *Vilcinskas v. Johnson*, 252 Neb. 292, 562 N.W.2d 57 (1997).

Although Einspahr was not a specialist in either urology or neurology, he does hold a medical degree and testified that while at medical school, he had some training in urology. Moreover, he is a board-certified internist. He explained that "internal medicine, basically, deals with the care of the adult patient . . . it really covers . . . any type of problem that may effect [sic] the adult patient" and that Dean's urological symptoms include the types of symptoms that he would evaluate in his practice as an internist. Further, the record shows that Pattee, a neurologist, felt confident enough with Einspahr's ability to diagnose bladder conditions that he referred Dean to him. These factors indicate that Einspahr's knowledge of bladder maladies was such that his opinion had probative value. Thus, the court's ruling that Einspahr was qualified to testify as an expert was not erroneous.

### (c) Reliability of Einspahr's Differential Diagnosis

#### (i) Daubert/Schafersman *Framework*

Under rule 702, it is not enough that a witness is qualified as an expert. The trial court must also act as a gatekeeper to ensure the evidentiary relevance and reliability of the expert's opinion. *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). In *Schafersman*, we rejected the "general acceptance" test for determining the admissibility of an expert's testimony. In its place, we adopted the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and its progeny, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), and *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). Specifically, we held:

> [I]n those limited situations in which a court is faced with a decision regarding the admissibility of expert opinion evidence, the trial judge must determine at the outset, pursuant to Neb. Evid. R. 702, whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment whether the reasoning or methodology underlying the

testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.

*Schafersman v. Agland Coop*, 262 Neb. at 232, 631 N.W.2d at 876-77. We further explained:

> In determining the admissibility of an expert's testimony, a trial judge may consider several more specific factors that *Daubert* said might "bear on" a judge's gatekeeping determination. See [*Kumho Tire Co. v. Carmichael, supra*]. These factors include whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. See *id.* These factors are, however, neither exclusive nor binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances. See, e.g., *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000), *cert. denied*, 532 U.S. 921, 121 S. Ct. 1357, 149 L. Ed. 2d 287 (2001) (setting forth additional factors to be considered).

*Schafersman v. Agland Coop*, 262 Neb. at 233, 631 N.W.2d at 877.

There is, however, an ambiguity in *Schafersman*. At one point, we drew a distinction between a methodology and the application of a methodology. We stated that "once the validity of the expert's reasoning or methodology has been satisfactorily established, any remaining questions regarding the manner in which that methodology was *applied* in a particular case will generally go to the weight of such evidence." (Emphasis in original.) *Id.* at 232, 631 N.W.2d at 877. Since *Schafersman*, we have repeated, but not applied, this dictum twice more. See, *Perry Lumber Co. v. Durable Servs.*, 266 Neb. 517, 667 N.W.2d 194 (2003); *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003).

But other language in *Schafersman* casts doubt upon the distinction between a methodology and its application. We said, "In evaluating expert opinion testimony under *Daubert*, when such testimony's factual basis, data, principles, methods, or *their*

*application are called sufficiently into question*, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." (Emphasis supplied.) *Schafersman v. Agland Coop*, 262 Neb. 215, 233, 631 N.W.2d 862, 877 (2001). Thus, we find it necessary to clarify whether a court, having determined that a methodology is reliable at a general level, must also decide if the expert seeking to testify reliably applied the methodology.

Following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), there was some debate in the federal courts over whether an expert's deviation from an otherwise reliable methodology went to admissibility or weight. See Christopher B. Mueller, *Daubert Asks the Right Questions: Now Appellate Courts Should Help Find the Right Answers*, 33 Seton Hall L. Rev. 987 (2003). Some courts held (or at least suggested) that if the methodology the expert claimed to be using was generally reliable, the expert's opinion was reliable enough to be admissible under *Daubert*; any misapplications in the methodology were for the fact finder to sort out. See, e.g., *U.S. v. Chischilly*, 30 F.3d 1144 (9th Cir. 1994). See, also, *State v. Porter*, 241 Conn. 57, 698 A.2d 739 (1997). But it soon became apparent to most courts that the distinction between methodology and application was unworkable. As one often-cited opinion explained:

> [I]t is extremely elusive to attempt to ascertain which of an expert's steps constitute parts of a "basic" methodology and which constitute changes from that methodology. If a laboratory consistently fails to use certain quality controls so that its results are rendered unreliable, attempting to ascertain whether the lack of quality controls constitutes a failure of a methodology or a failure of application of methodology may be an exercise in metaphysics. Moreover, any misapplication of a methodology that is significant enough to render it unreliable is likely to also be significant enough to skew the methodology.

*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994). See, also, *Cavallo v. Star Enterprise*, 892 F. Supp. 756 (E.D. Va. 1995), *affirmed in part* 100 F.3d 1150 (4th Cir. 1996).

For the federal courts, the confusion was cleared up with the 2000 amendments to Fed. R. Evid. 702. The 2000 amendments were meant to codify *Daubert* and its progeny. The revised rule explicitly requires courts to determine if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) *the witness has applied the principles and methods reliably to the facts of the case*." (Emphasis supplied.) 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure 19 (Supp. 2002). The advisory committee's note to the 2000 amendment explains that the "amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." *Id.* at 21-22. See, also, Mueller, *supra* (noting that amendment to rule 702 settled debate in federal courts).

We agree with the approach that has become prevalent in the federal courts. We are skeptical that there is a meaningful distinction between a methodology and the application of that methodology. When a step in an otherwise valid methodology is performed incorrectly, we fail to see how the expert's results can be any more reliable than if the methodology itself had been wholly invalid. Accordingly, we hold that it is not enough for the trial court to determine that an expert's methodology is valid in the abstract. The trial court must also determine if the witness has applied the methodology in a reliable manner.

With this framework in mind, we turn to the question whether Einspahr's expert testimony was reliable.

### (ii) Einspahr's Differential Diagnosis

Einspahr reached his conclusion that the collision caused Dean to develop neurogenic bladder after conducting a differential diagnosis. Courts have recognized that "differential diagnosis *generally* is a technique that has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results." (Emphasis supplied.) *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 758. See, *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591 (Tex. App. 2002). See, also, *Schafersman v. Agland Coop*, 262 Neb. 215, 631

N.W.2d 862 (2001). But that does not mean that simply by uttering the phrase "differential diagnosis," an expert can make his or her opinion admissible. Rather, the question will be whether the expert conducted a *reliable* differential diagnosis. See, *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202 (8th Cir. 2000); *In re Paoli R.R. Yard PCB Litigation, supra.*

The first step in conducting a reliable differential diagnosis is to "compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003) (as amended on denial of rehearing (Sept. 25, 2003)). At this stage of the analysis, the question is which of the "competing causes are *generally* capable of causing the patient's symptoms." *Id.* at 1057-58. If the expert "rules in" a potential cause that is not capable of causing the patient's symptoms, the expert's opinion is of questionable reliability. See *id.* Similarly, if the expert *completely* fails to consider a cause that could explain the patient's symptoms, the differential diagnosis is not reliable. See *id.* Cf. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) ("if an expert utterly fails to consider alternative causes . . . a district court is justified in excluding the expert's testimony").

Once the expert has ruled in all plausible causes for the patient's condition, the next step is to "engage in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case." *Clausen v. M/V New Carissa*, 339 F.3d at 1058. In analyzing the second step of a differential diagnosis under the *Daubert/Schafersman* framework, the question is whether the expert had a reasonable basis for concluding that one of the plausible causative agents was the most likely culprit for the patient's symptoms. In other words, the expert must be able to show good grounds for eliminating other potential hypotheses. See, *Clausen v. M/V New Carissa, supra*; *Heller v. Shaw Industries, Inc.*, 167 F.3d 146 (3d Cir. 1999); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994); *Nelson v. American Home Products Corp.*, 92 F. Supp. 2d 954 (W.D. Mo. 2000).

What constitutes good grounds for eliminating other potential hypotheses will vary depending upon the circumstances of each

case. But some generalizations are possible. Subjective beliefs and unsupported speculation will never suffice. See *Clausen v. M/V New Carissa, supra.* Likewise, conclusions based on discredited or improperly performed diagnostic tools are suspect. To take an extreme example, if a physician were to testify that he had eliminated a plausible cause for the patient's condition by employing palmistry, a court would be justified in excluding the opinion. Conversely, a decision to eliminate an alternative hypothesis based on information gathered by using the traditional tools of clinical medicine—physical examinations, medical histories, and medical testing—will usually have the hallmarks of reliability required by *Daubert* and *Schafersman.* See *In re Paoli R.R. Yard PCB Litigation, supra.* But we emphasize that these are just guideposts and that often, an expert's decision to rule out an alternative hypothesis will depend on other factors for which clear rules are not available.

Here, there is no debate about whether Einspahr correctly performed the first step of his differential diagnosis. The parties agree that trauma is capable of causing neurogenic bladder and that Einspahr properly ruled in other causes that could have explained Dean's condition. Instead, the appellants focus on the "ruling out" portion of his analysis. They contend that instead of relying on good grounds for his opinion, Einspahr improperly relied exclusively upon the temporal connection between the collision and the onset of symptoms.

Courts have been cautious when faced with an expert opinion based on the temporal connection between exposure to an agent and the onset of symptoms. See Joseph Sanders & Julie Machal-Fulks, *The Admissibility of Differential Diagnosis Testimony to Prove Causation in Toxic Tort Cases: The Interplay of Adjective and Substantive Law*, 64 Law & Contemp. Probs. 107 (Autumn 2001). That symptom Z occurred after event Y will generally not support the conclusion that Y caused Z. See, *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999); *Moore v. Ashland Chemical Inc.*, 151 F.3d 269 (5th Cir. 1998); *Nelson v. American Home Products Corp., supra*; *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (dismissing expert's opinion that contaminated feed caused cows to become ill when only basis for opinion was that cows became ill after eating feed); Sanders

& Machal-Fulks, *supra.* But many of these cases involved situations where there was no previous scientific evidence showing that the agent in question was capable of causing the plaintiff's condition. See, *Moore v. Ashland Chemical Inc., supra*; *Schafersman v. Agland Coop, supra.* When a patient develops symptoms after encountering an agent which is known to be capable of causing those symptoms, courts have been more willing to admit expert testimony relying on the temporal connection between exposure and the onset of symptoms. See, *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999); *Moore v. Ashland Chemical Inc., supra.* Cf. *Heller v. Shaw Industries, Inc.*, 167 F.3d 146 (3d Cir. 1999). Here, it is undisputed that trauma is capable of causing neurogenic bladder, and thus Einspahr's reliance upon the temporal factor is entitled to greater weight.

Moreover, we note that the appellants overstate the extent to which Einspahr relied on the temporal connection between the collision and the onset of symptoms. Most of Einspahr's "ruling out" decisions were based on the results of well-accepted clinical diagnostic techniques. Based on Einspahr's own physical examinations of Dean and the physical examinations and medical testing of Dean by other qualified physicians, Einspahr ruled out obstructions to the urinary tract, multiple sclerosis, injury to the spinal cord, tumors in the spinal cord, and infection. Similarly, Einspahr's rejection of McAninch's theory that prostatic enlargement was the only cause of Dean's condition was based on the results of prostate examinations done by himself, Henslee, and a physician at the Mayo Clinic after the collision but before McAninch's examination.

As discussed earlier, physical examinations and medical testing are standard procedures in the medical community and generally provide good grounds for eliminating hypotheses during the "ruling out" portion of a differential diagnosis. We also note that Einspahr's conclusions were not rendered invalid, because he relied on physical examinations and medical testing performed by the other physicians. "[I]t is . . . acceptable, in arriving at a diagnosis, for a physician to rely on examinations and tests performed by other medical practitioners." *Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 807 (3d Cir. 1997).

In fact, only one step in Einspahr's analytical process relied on the temporal connection between the collision and the onset of the symptoms—his conclusion that it was more likely that trauma from the collision injured the nervous system serving Dean's bladder than that Dean was suffering from idiopathic neurogenic bladder. We recognize that the other physicians that saw Dean disagreed with this step in Einspahr's analysis. But, given that Dean's bladder retention began 3 to 4 weeks after the collision and was accompanied by bruising and internal aching in the area where the nerve fibers serving the bladder run, the court acted within its discretion in determining that the temporal factor was strong enough and accompanied by enough other factors to serve as a reliable basis for Einspahr's conclusions. Accord *Curtis v. M&S Petroleum, Inc., supra* (holding that trial court abused its discretion in excluding expert's opinion that chemical exposure had caused refinery workers to become ill when (1) it was well accepted that exposure to chemical at level workers were exposed was capable of causing illness, (2) multiple workers developed symptoms shortly after exposure, and (3) workers' symptoms subsided after exposure ended).

### (iii) Alleged Concessions Made by Einspahr

In arguing that Einspahr's opinion was not admissible, the appellants also rely on what they claim are concessions made by Einspahr during cross-examination. During the trial, the following exchanges occurred between Einspahr and counsel for the appellants:

[Counsel]. You told me in your deposition that it is impossible to say what the cause of [Dean's] bladder condition is; correct?

[Einspahr]. Yes.

. . . .

Q. You are aware of no overt injuries that [Dean] may have suffered in the motor vehicle accident; correct?

A. No.

Q. That would —

A. That's correct.

Q. You can't describe how the — the injury could've occurred.

A. No.

Q. Or what part of his body was injured.

A. No.

Q. And you agree with the Mayo Clinic that it would be conjecture to explain how [Dean] developed a problem with his bladder after the motor vehicle accident.

A. I agree.

Q. And conjecture to you means what?

A. It's anyone's guess.

The appellants claim that in these exchanges, Einspahr effectively conceded that his opinion that the collision caused Dean's injuries was sheer speculation.

The interpretation of Einspahr's cross-examination testimony proffered by the appellants is not unreasonable, and if it were the only interpretation, we would agree that the district court erred in admitting Einspahr's opinion. Cf. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (stating that "perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence"). But after reviewing the record, we conclude that another reasonable interpretation for Einspahr's testimony exists. Given our abuse of discretion standard, we are bound to accept this second interpretation.

▮ It is plausible that Einspahr and the appellants' counsel were talking about different levels in the chain of medical causation.

> A physician, independent of legal issues, typically uses the term *causation* . . . to refer to the various levels of underlying abnormality that have substantially led to the next higher level of abnormality, disease, or diagnosis. This "chain," or web, of causation is considered the "pathogenesis" or pathophysiology of a disease.

Mary Sue Henifin et al., *Reference Guide on Medical Testimony*, in Reference Manual on Scientific Evidence 439, 451 (Federal Judicial Center 2d ed. 2000). As we understand Einspahr's testimony, he claims that the collision is the ultimate causative agent. The collision caused a trauma injury to Dean's nervous system, which in turn caused Dean's bladder condition. As we read Einspahr's cross-examination answers, he was not conceding that he was uncertain whether the ultimate causative agent

was the trauma Dean suffered in the collision. Rather, he meant that he could not fully trace the other steps in the "web of causation," i.e., the pathogenesis of Dean's bladder condition. Specifically, he could not pinpoint where Dean's nervous system had been injured in the collision or describe the exact manner in which that injury was causing Dean's bladder to malfunction. Thus, this second interpretation of Einspahr's cross-examination testimony is not inconsistent with his ultimate conclusion that the collision caused Dean's bladder condition.

■ The inability to trace the exact pathogenesis of Dean's bladder condition does not make Einspahr's opinion per se unreliable so long as other reliable factors supported his opinion that the collision was the ultimate causative agent. Cf. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995) ("[n]ot knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we do not know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*"). Here, even though he could not trace the exact pathogenesis of Dean's bladder condition, a number of other factors make Einspahr's testimony reliable: (1) trauma is a recognized cause of neurogenic bladder, (2) the close temporal connection between the collision and the onset of symptoms, and (3) the medical testing and physical examinations which ruled out several other plausible causes for Dean's bladder condition.

## 2. DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING VERDICT

In reference to the appellants' second assignment of error, they argue that they "were entitled to a directed verdict on the issue of whether [Dean's] bladder condition was caused by the accident because [the Carlsons] offered conflicting medical opinions as to the cause and nature of [Dean's] bladder condition." Brief for appellants at 29.

■ A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, when an issue should be decided as a matter of law. *Kinney v. H.P. Smith*

*Ford*, 266 Neb. 591, 667 N.W.2d 529 (2003). To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Moyer v. Nebraska City Airport Auth.*, 265 Neb. 201, 655 N.W.2d 855 (2003). Where opinion evidence of experts is in conflict, the resolution of the conflict becomes a question for the jury. *Palmer v. Forney*, 230 Neb. 1, 429 N.W.2d 712 (1988).

In addition to offering Einspahr's testimony, the Carlsons introduced into evidence the deposition of Singla, a board-certified urologist who saw Dean several times during 1999. Unlike Einspahr, Singla testified that it was unclear what was causing Dean's bladder retention. He based this conclusion on his testing of Dean, which testing had shown that the muscles in Dean's bladder were generating enough pressure to push the urine out of his bladder. Although Singla did not rule out the collision as the cause of Dean's bladder condition, he testified that if it had been the cause, he would have expected the retention to have begun almost immediately after the collision.

The record suggests that the appellants had originally planned to offer Singla's deposition during their case in chief. Apparently, by introducing Singla's deposition before the appellants had the opportunity to do so, the Carlsons sought to minimize the importance of his testimony. In their closing arguments, the Carlsons' counsel told the jury, "[Singla] was really friendly to us. And — I mean, we're not afraid of what . . . Singla said." The Carlsons' counsel emphasized that Singla conceded that he was not aware of all the facts surrounding Dean's injuries. The Carlsons' counsel also argued that even though Singla's testing had shown that the muscles in Dean's bladder were generating enough pressure to push the urine out of the bladder, he had also found that Dean's distal sphincter muscle was not relaxing. The Carlsons' counsel claimed that this was consistent with the theory that the nerves serving Dean's bladder were injured in the collision.

The appellants, as we understand it, argue for an exception to the rule that where the opinion evidence of experts is in conflict, the resolution of the conflict is for the jury. See *Palmer v. Forney, supra.* They contend that when a party who bears the burden of proof on the issue of medical causation offers conflicting expert

testimony on that question, the court should direct a verdict against the party. Applying their proposed exception to the facts here, the appellants claim that by introducing Singla's opinion, the Carlsons negated Einspahr's opinion as a matter of law, leaving the Carlsons with no evidence establishing a causal link between the collision and Dean's injuries.

We are not persuaded by the appellants' argument. It treats the decision to offer a hostile expert's opinion as the equivalent of conceding the correctness of that opinion. But no litigant would offer a hostile expert's opinion to concede a key element of its case. Rather, the decision to do so would be a tactical one meant to advance the litigant's position. Here, for example, the Carlsons introduced Singla's deposition so that they could minimize those aspects of it that were adverse to them. The appellants' argument is inconsistent with how litigation is practiced and would serve only as a trap for the unwary. We hold that where expert opinion evidence on medical causation is in conflict, the resolution of the conflict is a question for the jury, even if the party that bore the burden of proof on the issue introduced the conflicting testimony.

Here, Einspahr's testimony was sufficient to allow a reasonable jury to conclude that the collision caused Dean's bladder condition. This was not negated by the Carlsons' decision to introduce Singla's deposition. How to resolve the conflict between Einspahr's opinion and Singla's opinion was a question for the jury. Accordingly, the district court did not err in denying the appellants' motions for partial directed verdict and for judgment notwithstanding the verdict.

### 3. EXCESSIVENESS OF VERDICTS

The jury awarded Dean $894,901 and Karen $259,578. In their final assignment of error, the appellants argue that the court abused its discretion in denying a new trial because the verdicts were excessive. See Neb. Rev. Stat. § 25-1142 (Cum. Supp. 2002).

### (a) Verdict for Dean

Dean established that because of the collision, he has incurred $14,321.43 in medical expenses and property damage. He also presented evidence showing that his optic nerve was injured in

the collision and that as a result, he has lost some of the peripheral vision in his left eye. Most of his evidence on damages, however, focused on his bladder condition.

Dean presented reliable evidence establishing that because of the collision, his bladder will never function properly and that he will be forced to self-catheterize for the rest of his life. To self-catheterize, he uses a sterile catheter tube that is about 20 inches long and one-quarter inch in diameter. The end of the catheter is lubricated; Dean inserts the tube into his penis and pushes it up until the tube reaches his bladder. The motion is slow and causes pain which Dean compared to rubbing an open sore. He generally self-catheterizes three to four times per day.

In addition to testifying about the pain that self-catheterization causes him, Dean also presented evidence showing the risks and financial costs that he will incur because of his condition. Self-catheterization presents a significant risk of infection; to reduce the risk, Dean generally uses a new catheter each time that he self-catheterizes. When he first started self-catheterizing, a catheter cost $2.50; the current price is $4.30. Further, the risk of infection has interfered with Dean's business. He and his son own a company that cleans drains. Because by its nature the business is unsanitary, Dean goes home so that he can clean up before self-catheterizing.

The appellants characterize Dean's bladder condition as an "inconvenience" and argue that the jury's award was "excessive in light of [the] actual impact [Dean's] injuries have had on his life." Brief for appellants at 34. But on appeal, we give the fact finder's determination of damages great deference. *Brandon v. County of Richardson*, 264 Neb. 1020, 653 N.W.2d 829 (2002). An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000). A reasonable jury could have concluded that Dean's bladder condition is a significant disability which will force him to live with pain and to incur substantial costs for the remainder of his life. Accordingly, the jury's award for Dean was not the result of passion, prejudice, mistake, or some other means not apparent in the record.

### (b) Verdict for Karen

Karen sought damages for her medical expenses and pain and suffering. She suffered two cracked ribs in the collision and was treated at the hospital. After the collision, she developed an unusual amount of fatigue and a generalized sensation of pain, which she likened to having the flu. About 4 months after the collision, she was diagnosed as having posttraumatic stress syndrome, which she was told would improve in time. In addition, she was treated for her lingering pain by a chiropractor until May 1998, when he determined that she had reached maximum medical improvement. Karen continues to suffer from pain in her lower back and hip area. During her testimony, Karen described the pain as being "not intolerable pain" and stated that it is the type of pain that "an aspirin [can] take care of." Her documented medical expenses were $2,963.24.

Karen also made a consortium claim. Damages for loss of consortium represent compensation for a spouse who has been deprived of rights to which he or she is entitled because of the marriage relationship, namely, the other spouse's affection, companionship, comfort, and assistance and particularly his or her conjugal society. *Anson v. Fletcher*, 192 Neb. 317, 220 N.W.2d 371 (1974). Here, Karen testified that before the collision, she and Dean had a good sexual relationship, but that now the relationship is "pretty much non-existent." She further testified that Dean lacks the stamina that he had before the collision and that he is unable to perform household chores with the same regularity that he did before the collision.

The amount of evidence supporting the jury's verdict for Karen is not overwhelming. But we are dealing with types of damages—pain and suffering and loss of consortium—for which "the law provides no precise measurement." See *Brandon v. County of Richardson*, 264 Neb. 1020, 1029, 653 N.W.2d 829, 837 (2002). Although the verdict was generous, we conclude it was not so excessive as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. When viewed in a light most favorable to Karen, the evidence shows that because of the collision, she has suffered and will continue to suffer some pain, and that because of Dean's injuries, she suffered a loss of Dean's assistance and conjugal society. Thus, the

court acted within its discretion in concluding that the jury verdict for Karen was not excessive.

AFFIRMED.