policy limits before it and was therefore able to divide pro rata the loss that remained after exhaustion of the two primary policies. Thus, Regent, under its umbrella policy, was liable in contribution to American Family for four-ninths of the cost of payments made and to be made to the guest under American Family's umbrella policy. We find that apportionment was correct.

## VI. CONCLUSION

For all the reasons stated above, we agree with the district court's apportionment of the common obligation toward the guest's settlement. We affirm the district court's order granting summary judgment in favor of American Family.

Affirmed.

———————

Leo W. Hike, Jr., and Joanna K. Hike, husband
and wife, appellants, v. State of Nebraska
Department of Roads, appellee.

___ N.W.2d ___

Filed May 9, 2014.     No. S-12-1080.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Judges: Evidence: Appeal and Error.** The exercise of judicial discretion is implicit in determining the relevance of evidence, and a trial court's decision regarding relevance will not be reversed absent an abuse of discretion.

3. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.

4. **Motions for Mistrial: Appeal and Error.** Decisions regarding motions for mistrial are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion.

5. **Motions for New Trial: Appeal and Error.** An appellate court reviews a denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion.

6. **Eminent Domain: Words and Phrases.** Eminent domain is the inherent power of a governmental entity to take privately owned property, especially land, and convert it to public use, subject to reasonable compensation for the taking.

7. **Eminent Domain: Damages.** In a condemnation action, there are two elements of damage: (1) market value of the land taken or appropriated and (2) diminution in value of the land remaining, less special benefits.

8. **Real Estate: Valuation.** The market value of property includes its value for any reasonable use to which it may be put. If, by reason of its surroundings, its natural advantages, its artificial improvements, or its intrinsic character, it is peculiarly adapted to some particular use, all the circumstances which make up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating compensation. The proper inquiry is, what is its fair market value in view of any reasonable use to which it may be applied and all the reasonable uses to which it is adapted? The adaptability must be reasonably probable, not merely possible. And the adaptability must be reasonably expected in the immediate future.

9. **Appeal and Error.** Errors argued but not assigned will not be considered on appeal.

10. **Expert Witnesses.** Expert testimony should not be received if it appears that the witness is not in possession of such facts as will enable the expert to express a reasonably accurate conclusion, and where the opinion is based on facts shown not to be true, the opinion lacks probative value. The opinion must have a sufficient factual basis so that the opinion is not mere conjecture or guess.

11. **Trial: Expert Witnesses: Appeal and Error.** A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion.

12. **Jury Instructions: Appeal and Error.** In reviewing a claim of prejudice from instructions given or refused, an appellate court must read the instructions together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error.

13. **Motions for Mistrial.** A mistrial is appropriate when an event occurs during the course of a trial which is of such a nature that its damaging effects would prevent a fair trial.

14. **Motions for Mistrial: Juries.** Generally, a mistrial is only warranted where unfairness has been injected into a jury trial and so permeates the proceedings that no amount of admonition to the jury can remove the unfairness to a party.

15. ____: ____. A trial court has considerable discretion in determining when an event occurring during a trial can be rectified by a cautionary instruction or is so prejudicial as to warrant a mistrial.

Appeal from the District Court for Sarpy County: WILLIAM B. ZASTERA, Judge. Affirmed.

Jason M. Bruno and Robert S. Sherrets, of Sherrets, Bruno & Vogt, L.L.C., for appellants.

Jon Bruning, Attorney General, and Martel J. Bundy for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Stephan, J.

Through its power of eminent domain, the State of Nebraska Department of Roads (NDOR) took certain real property owned by Leo W. Hike, Jr., and Joanna K. Hike, husband and wife, because it was needed for a highway project. The parties were unable to agree on appropriate compensation for the taking, and a jury trial was held to determine damages. After a 5-day trial, the jury returned a verdict in favor of the Hikes for $53,209. The Hikes filed this timely appeal, contending the trial court made various evidentiary and instructional errors which entitle them to a new trial. We find no error and affirm the jury verdict.

## I. FACTS

The Hikes owned 6.7 acres of land legally described as the northeast quarter of Section 22, Township 13 North, Range 13 East of the 6th P.M., in Sarpy County, Nebraska. The property is located on the west side of U.S. Highway 75, just south of Platteview Road, in Bellevue, Nebraska. The Hikes purchased most of the property in 2001 and added an additional tract in 2003. The total purchase price was $260,000. The Hikes' property included an easement over a neighbor's adjoining property to a 30-foot-wide graded driveway which directly accessed Highway 75 at a point south of the Hikes' property. Prior to the taking, this driveway was the only means of access from the Hikes' property to a public road.

In May 2008, NDOR acquired 1.05 acres of the land, including the easement to the driveway and the access to Highway 75. After the taking, NDOR provided the Hikes temporary access to Platteview Road via a concrete driveway, and NDOR is legally obligated to provide the Hikes direct paved access to a newly constructed Platteview Road after the highway project is completed. After the taking, the Hikes no longer had direct access to Highway 75.

The primary issue at trial was the property's highest and best use as of May 2, 2008, the date of the taking. The nature and possible uses of the Hikes' pretaking access to Highway 75 was a critical factor in the highest and best use analysis.

Leo Hike is a real estate broker and serves as a Sarpy County commissioner. He formerly served as a Bellevue planning commissioner. He testified that prior to 2008, he intended to develop the property commercially using the 30-foot graded access onto Highway 75. He acknowledged that it would have been necessary to have the property rezoned in order to develop it commercially and that the city of Bellevue had zoning jurisdiction over his property. He further acknowledged that in 2008, the Bellevue Planning Commission's street design standards for commercial zoning access required a 50-foot right-of-way. Leo Hike thought the standards could be read to require only 25 feet of actual roadway so that his existing access would be sufficient to support commercial development. Alternatively, he thought the Bellevue City Council was likely to waive the 50-foot requirement so he could zone his property commercial with the existing driveway. He also testified that he thought he could obtain additional access to Highway 75, if needed, by purchasing it from the State of Nebraska.

Two appraisers and a commercial real estate developer testified on behalf of the Hikes as to their opinions that the highest and best use of the property before the taking was speculative holding for future commercial development. One appraiser testified that it would be possible to develop the property commercially with the existing driveway. He admitted on cross-examination that before the taking, the 30-foot driveway was "probably not wide enough" for commercial access, but testified that it was "reasonable to assume" that there could have been a solution to this problem which would have permitted commercial development prior to the taking.

The Hikes' other appraiser generally testified that the existing driveway was sufficient to support commercial development of the property. The real estate developer also testified that the property could be developed commercially based on the existing 30-foot graded driveway. These witnesses

generally testified that because the highest and best use of the property before the taking was holding it for future commercial development, its value was between $3 and $4 per square foot, or $130,680 to $174,240 per acre. They further testified that because the taking removed the property's access to Highway 75, after the taking, the highest and best use of the property was for residential use, reducing its value to between $20,000 and approximately $80,000 per acre.

In contrast, NDOR presented testimony of two appraisers and an engineer/land developer to the effect that the existing driveway was not sufficient to support commercial development and that therefore, the highest and best use of the property both before and after the taking was residential. The engineer/developer testified that the 30-foot graded driveway would not have supported commercial development. He opined that 36 feet of paved road would be needed for commercial traffic, but admitted on cross-examination that the development could perhaps be done with two 11-foot paved lanes. One appraiser opined that the 30-foot graded driveway would support residential use only. And appraiser George Tesar, Jr., testified the 30-foot driveway was adequate access for residential use but would not have supported commercial development of the land. These witnesses testified that because the highest and best use of the property before the taking was residential use, its value was between $25,000 and $35,000 per acre. They testified that the highest and best use after the taking remained the same, as did the value. They opined that the value was the same before and after the taking, because the access before and after the taking was substantially the same, even though its physical location had changed from Highway 75 to Platteview Road.

NDOR also introduced evidence that since 1957, it had owned all access rights from the Hikes' property to Highway 75, other than the 30-foot graded driveway. In addition, it introduced evidence that as early as 1998, it had planned to make Highway 75 a freeway and close all access points to it, and that the public had been made aware of these plans in 1998 and in the following years via public hearings. NDOR contended that this evidence demonstrated that it would never have granted

the Hikes any access to Highway 75 beyond what they possessed via the easement to the 30-foot graded driveway.

Additional relevant facts are set forth in our analysis of the Hikes' specific assignments of error.

## II. ASSIGNMENTS OF ERROR

The Hikes assign that the district court erred in (1) allowing NDOR to offer evidence that it intended to take the Hikes' property a decade prior to the time it filed the condemnation petition, (2) failing to instruct the jury that it could not consider NDOR's intent to acquire the Hikes' property in considering fair market value, (3) allowing evidence and argument intended to diminish the taking, (4) failing to instruct the jury that the elimination of the Hikes' easement and access was compensable, (5) refusing to strike the testimony of appraiser Tesar, (6) not allowing appraiser Joel Walker to testify, (7) refusing to allow the Hikes to offer evidence of structural damage that diminished the fair market value of their property, (8) failing to grant a mistrial based upon a statement made by counsel for NDOR in his closing argument, and (9) refusing to grant the Hikes' motion for new trial.

## III. STANDARD OF REVIEW

[1,2] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[1] The exercise of judicial discretion is implicit in determining the relevance of evidence, and a trial court's decision regarding relevance will not be reversed absent an abuse of discretion.[2]

[3] To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the

---

[1] *In re Invol. Dissolution of Wiles Bros.*, 285 Neb. 920, 830 N.W.2d 474 (2013); *Simon v. Drake*, 285 Neb. 784, 829 N.W.2d 686 (2013).

[2] *Richardson v. Children's Hosp.*, 280 Neb. 396, 787 N.W.2d 235 (2010).

evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[3]

[4,5] Decisions regarding motions for mistrial are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion.[4] An appellate court reviews a denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion.[5]

## IV. ANALYSIS

[6,7] This is a condemnation proceeding involving the exercise of eminent domain by a governmental entity. Eminent domain is "'[t]he inherent power of a governmental entity to take privately owned property, esp[ecially] land, and convert it to public use, subject to reasonable compensation for the taking.'"[6] Under the Nebraska Constitution, "The property of no person shall be taken or damaged for public use without just compensation therefor."[7] In a condemnation action, there are two elements of damage: (1) market value of the land taken or appropriated and (2) diminution in value of the land remaining, less special benefits.[8]

The principal disputed issue at trial was the fair market value of the Hikes' property immediately prior to the taking, which depended on whether the property's highest and best use at the time was residential or commercial. It was undisputed that the property was zoned for residential use. But the Hikes contended that it had potential for commercial development in the future and, thus, had a higher value. NDOR, on the other

---

[3] *InterCall, Inc. v. Egenera, Inc.*, 284 Neb. 801, 824 N.W.2d 12 (2012); *Sturzenegger v. Father Flanagan's Boys' Home*, 276 Neb. 327, 754 N.W.2d 406 (2008).

[4] *Sturzenegger v. Father Flanagan's Boys' Home, supra* note 3.

[5] *InterCall, Inc. v. Egenera, Inc., supra* note 3.

[6] *Pinnacle Enters. v. City of Papillion,* 286 Neb. 322, 333, 836 N.W.2d 588, 596 (2013), quoting Black's Law Dictionary 601 (9th ed. 2009).

[7] Neb. Const. art. I, § 21.

[8] *Moyer v. Nebraska City Airport Auth.*, 265 Neb. 201, 655 N.W.2d 855 (2003); *Sorensen v. Lower Niobrara Nat. Resources Dist.*, 221 Neb. 180, 376 N.W.2d 539 (1985) (superseded by statute on other grounds).

hand, took the position that the property was not suitable for commercial development prior to the taking and therefore must be valued as residential property. The amount of the jury's verdict suggests that it agreed with NDOR.

[8] In Nebraska, the market value of property includes its value for any reasonable use to which it may be put.[9] If, by reason of its surroundings, its natural advantages, its artificial improvements, or its intrinsic character, it is peculiarly adapted to some particular use, all the circumstances which make up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating compensation.[10] The proper inquiry is, what is its fair market value in view of any reasonable use to which it may be applied and all the reasonable uses to which it is adapted?[11] The adaptability must be reasonably probable, not merely possible.[12] And the adaptability must be reasonably expected in the immediate future.[13]

With these general principles in mind, we turn to the specific issues presented in this appeal.

## 1. Evidentiary Issues

### (a) NDOR's Intent to Take

The Hikes contend the district court erred in receiving evidence that showed NDOR planned to acquire their property as early as 1998. The Hikes contend this evidence was used to diminish the pretaking fair market value of the property and to confuse the jury about what NDOR was actually taking. The specific evidence identified by the Hikes as improperly admitted includes several exhibits documenting the fact that NDOR began planning to build a restricted-access freeway within the Highway 75 right-of-way as early as 1998. These

---

[9] *Johnson v. Nebraska Public Power Dist.*, 187 Neb. 421, 191 N.W.2d 594 (1971). See *Leffelman v. City of Hartington*, 173 Neb. 259, 113 N.W.2d 107 (1962).

[10] *Johnson v. Nebraska Public Power Dist., supra* note 9.

[11] *Id.*

[12] *Id.*

[13] *Id.*

exhibits were admitted or referenced during the testimony of an NDOR engineer who was NDOR's assistant design engineer on the Highway 75 project. He testified that because NDOR had planned to make Highway 75 a freeway as early as 1998, on the date of the taking, it would have been impossible for the Hikes to obtain additional access to Highway 75 from the State.

The Hikes contend that this evidence was improper, because it "led the jury to believe that the Hikes' access had already been taken and [NDOR] did not need to fully compensate the Hikes for the taking or that the Hikes' Property could never have any commercial value."[14] They also argue that the admission of the evidence, or at least the reference to it in NDOR's closing argument, violated Neb. Rev. Stat. § 76-710.01 (Reissue 2009), which provides in relevant part:

> Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than due to physical deterioration within the reasonable control of the owner, shall be disregarded in determining the compensation for the property.

The Hikes contend that based on this statute, the fact that NDOR planned to take their access point to Highway 75 in connection with construction of the freeway could not be considered in determining the fair market value of their property prior to the taking.

We conclude that the challenged evidence was relevant to the Hikes' contention that their property had the potential for future commercial development and was therefore more valuable than its pretaking residential use would otherwise warrant. Contrary to the Hikes' contention, NDOR did not take the position at trial that it was not required to compensate the Hikes for the loss of their easement access to Highway 75. But it did contend, in response to the Hikes' claim that the property which they purchased in 2001 and 2003 had added value

---

[14] Brief for appellants at 9.

because of its potential for future commercial development, that the easement access would not have permitted such development. Leo Hike testified that he thought the existing access was sufficient for commercial development, but that if it was not, he could have obtained additional access from the State. NDOR was entitled to rebut the inference created by this testimony by showing that it would never have granted additional access. NDOR presented evidence that prior to the taking, it owned all access rights to Highway 75 *except* the 30-foot easement access and that if the Hikes had sought to purchase additional access, it would have refused to sell because of its longstanding intent to build a restricted-access freeway adjacent to the Hikes' property. This evidence was clearly relevant to the question whether, prior to the taking, it was reasonably probable that the property could be adapted to commercial use and thus should be valued accordingly.

The admissibility of this evidence was not affected by the provisions of § 76-710.01. NDOR's evidence was not that the fair market value of the property was increased or decreased by the plans to construct the freeway, but, rather, that there was no reasonable expectation of acquiring additional access. We do not read § 76-710.01 to provide that a party may purchase property adjacent to a planned public improvement and then, when a portion of the property is taken for the improvement, insist that the property be valued on the basis of some potential future use that could never have occurred because of the planned improvement.

### (b) Testimony of Appraiser Tesar

#### (i) Access

The Hikes assign that "the district court erred by allowing evidence and argument intended to diminish the taking." They argue that NDOR attempted "to repeatedly diminish the taking and confuse and mislead the jury by claiming that the elimination of access and the Hikes' easement . . . was not a compensable property right."[15] The only evidence identified by the Hikes with respect to this broad assignment of error is certain

---

[15] Brief for appellants at 16.

testimony of Tesar, one of the licensed real estate appraisers retained by NDOR to appraise the Hikes' property. Tesar testified that the only access to Highway 75 from the Hikes' property was the easement across the adjoining property and that, in his opinion, this would not have been adequate for any land use other than residential. Tesar testified without objection that the highest and best use of the Hikes' property, both before and after the taking, was residential.

The testimony the Hikes now contend was erroneously received was actually elicited in their cross-examination of Tesar. Referring to the Hikes' pretaking easement access to Highway 75, counsel asked Tesar if it was necessary for the State to file a lawsuit "[i]n order to stop the Hikes from driving in and out of that little strip there off Highway 75 . . . ." Tesar responded: "I don't believe so. They — the right-of-way, or the access — the control of access was purchased . . . prior to this condemnation. I believe it was February of '07, it [was] purchased." The Hikes argue that this testimony, which they elicited and did not move to strike, misled the jury into the belief that NDOR was not required to compensate the Hikes for the loss of their easement access to Highway 75.

The record does not support this argument. When Tesar was cross-examined further on this point, he testified that he did consider the Hikes' loss of access to be compensable and was actually told by NDOR to ignore the fact that the access point had been taken in the prior action involving the owner of that property. He denied that he had been told by NDOR not to assign any value to the Hikes' loss of access. On redirect examination, Tesar testified that NDOR told him to assume that the Hikes "still had access to their property using the easement over the [adjoining] property," which consisted of the 30-foot graded drive, and that he made this assumption in arriving at his opinions with respect to value.

The Hikes also argue that "[o]n several occasions," they made motions for mistrial, "because NDOR repeatedly insinuated and expressly told the jury that it did not have to compensate the Hikes for the easement or the access,"[16] and that

---

[16] *Id*. at 17.

the court erred in overruling these motions. They cite to a single instance in which the district court overruled their motion for mistrial on various grounds, including a claim that NDOR "has been allowed to insinuate to the jury that [NDOR has] own[ed] this access since approximately 1998." This motion was unrelated to Tesar's testimony and was made immediately before the Hikes rested their case in chief.

[9] We need not consider the district court's ruling on this motion for mistrial because it was not specifically assigned as error. Errors argued but not assigned will not be considered on appeal.[17] However, from our review of the record, we find no argument or suggestion by NDOR that the Hikes' loss of easement access to Highway 75 should not be considered in determining their damages. NDOR's consistent position was that the easement access was a part of the taking, but that the access would not have been sufficient to support commercial development and that NDOR would not have granted any additional access which would have permitted commercial development. As we have noted, NDOR was entitled to make this argument in response to the Hikes' claim that their property was adaptable to commercial use immediately prior to the taking.

### (ii) Value

Based on his opinion that the highest and best use of the Hikes' property before and after the taking was residential, Tesar testified without objection that just compensation for the taking would be $26,250 for the 1.05 acre tract and $320 for the new access easement. During cross-examination, the Hikes moved to strike Tesar's testimony regarding value and the court overruled the motion. The Hikes argue that this was error, relying on the proposition that an expert's opinion based on a misinterpretation or misconception of applicable law renders the opinion irrelevant.[18]

---

[17] *Butler County Dairy v. Butler County*, 285 Neb. 408, 827 N.W.2d 267 (2013); *Bacon v. DBI/SALA*, 284 Neb. 579, 822 N.W.2d 14 (2012).

[18] See *Sorensen v. Lower Niobrara Nat. Resources Dist., supra* note 8.

The Hikes' argument focuses on the following colloquy during Tesar's direct examination:

>  [Counsel for NDOR:] So [Leo] Hike had no access to the highway along the entire stretch of his property?
>
>  [Tesar:] No physical or legal?
>
>  Q. No legal.
>
>  A. No legal access.
>
>  Q. Would that be fair to say?
>
>  A. Correct.

The Hikes argue that this was a misstatement of law and fact because it was undisputed that their 30-foot easement access to Highway 75 was included in the taking. But we read the question and Tesar's answer as focusing on the narrower question whether, prior to the taking, the Hikes had access directly from their property to Highway 75. And the record is clear that they did not; their only access was by way of the easement over the adjoining property to the south. As noted, Tesar acknowledged the loss of this easement and factored it into his opinion regarding the compensation to which the Hikes were entitled.

The Hikes also contend that Tesar's opinion was inadmissible because he failed to place any value on the loss of the easement or the access to Highway 75. Tesar testified that he did not place any value on the loss of the easement access to Highway 75 because it was his opinion that the replacement access provided by NDOR was equal to the lost access, so that there was no compensable loss. While this opinion may be disputed factually, it is not based on an improper or incorrect legal interpretation.

The Hikes also contend that Tesar's opinion was inadmissible because he based his opinion of the value of the property before the taking on "the very improvements that caused the taking."[19] During his testimony, Tesar generally admitted that he used the city of Bellevue's future land use plan when formulating his opinion. This plan was based on the completion and existence of the highway project, and thus

---

[19] Brief for appellants at 22.

the Hikes contend this evidence also violated the principle of § 76-710.01 by inflating the value of the property before the taking based on the very project the property was taken for. The Hikes moved to strike Tesar's testimony because he relied on this plan.

On direct examination, Tesar stated that he relied on the future land use plan primarily to determine the possible zoning designations of the Hikes' property, but on cross-examination, he conceded that he also considered it in formulating his opinion that the highest and best use of the property was residential. Although this was an improper factual basis for Tesar's opinion, we conclude that it did not render his entire opinion inadmissible.

[10,11] Expert testimony should not be received if it appears that the witness is not in possession of such facts as will enable the expert to express a reasonably accurate conclusion, and where the opinion is based on facts shown not to be true, the opinion lacks probative value. The opinion must have a sufficient factual basis so that the opinion is not mere conjecture or guess.[20] Here, Tesar relied on one improper fact in formulating his opinion. But it is clear from his testimony that he did not exclusively or even substantially rely on that fact. Instead, it was simply one of many factors that he considered in forming an opinion as to the highest and best use of the land. And he was cross-examined about his use of the information. We conclude that his improper reliance on the future plan goes to the weight of his testimony, not its admissibility. A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion.[21] The district court did not abuse its discretion in overruling the Hikes' motion to strike Tesar's testimony.

---

[20] *Gary's Implement v. Bridgeport Tractor Parts*, 281 Neb. 281, 799 N.W.2d 249 (2011). See, also, *Sorensen v. Lower Niobrara Nat. Resources Dist.*, *supra* note 8.

[21] *Prime Home Care v. Pathways to Compassion*, 283 Neb. 77, 809 N.W.2d 751 (2012); *Richardson v. Children's Hosp.*, *supra* note 2.

(c) Testimony of Appraiser Walker

Joel Walker was a former NDOR staff appraiser who conducted the appraisal for acquisition of the Hikes' property in accordance with NDOR's statutory duty to negotiate in good faith.[22] In this context, he had various communications with Leo Hike in 2005 and 2006 in which they discussed comparable sales.

Walker was not called by NDOR as a witness at trial. But the Hikes called him and attempted to elicit testimony that he told Leo Hike the property had commercial value and that he thought a commercial sale at 18310 Highway 370 was a comparable sale. NDOR objected to this testimony as irrelevant, and the district court refused to allow it. In this appeal, the Hikes contend Walker's testimony should have been admitted because it enhanced Leo Hike's testimony and impeached NDOR's credibility.

We addressed a similar issue in *In re Application of SID No. 384*.[23] There, the property owners attempted to introduce into evidence the original notice of acquisition filed by the condemnor, claiming it was filed before negotiations began and was admissible as an offer of the value of the property taken. We held that the district court did not abuse its discretion in excluding this notice, because it was a part of the statutorily required settlement negotiation which preceded the condemnation action and was therefore inadmissible pursuant to the provision of Neb. Rev. Stat. § 27-408 (Reissue 2008) which states that evidence of conduct or statements made in compromise negotiations is not admissible.

The purported statements by Walker to Leo Hike were likewise inadmissible under § 27-408. And we are not persuaded by the Hikes' argument that NDOR waived the protection imposed by § 27-408 by cross-examining Leo Hike with respect to statements he made to Walker. We note that the Hikes did not object to this cross-examination by NDOR. The fact that the Hikes failed to assert § 27-408 during the cross-examination of Leo Hike does not prevent NDOR

---

[22] See Neb. Rev. Stat. § 76-704.01(6) (Reissue 2009).

[23] *In re Application of SID No. 384*, 259 Neb. 351, 609 N.W.2d 679 (2000).

from asserting irrelevancy based on § 27-408 during the Hikes' direct examination of Walker. The district court did not abuse its discretion in sustaining NDOR's objection to this testimony.

### (d) Evidence of Structural Damage

Prior to trial, the court entered an order in limine preventing the Hikes from offering any evidence of structural damage caused to their home by the construction of the highway project. The Hikes made two offers of proof during trial and now argue that the exclusion of this evidence was prejudicial error because it prevented them from obtaining full compensation for the taking.

The Hikes argue that Nebraska law requires that a property owner be compensated for all "'property that is damaged'" by a taking "'in the sense that the market value of the property has been diminished even if the property is not actually taken.'"[24] While this is an accurate statement of the law, it is applied out of context. Any structural damage caused to the Hikes' home was not the proximate result of the taking, but, rather, was caused by conduct that occurred after the taking with respect to the use of the property by the condemnor or its contractors. Although the Hikes may have a remedy with respect to such damage, it is not compensable in this condemnation proceeding.[25]

## 2. Jury Instructions

### (a) Intent to Take

The Hikes argue that even if the evidence with respect to NDOR's longstanding intent to acquire all access points along Highway 75 was admissible, as we conclude it was, the district court should have instructed the jury to not consider this intent in determining the fair market value of their property. In this regard, the jury was instructed:

---

[24] Brief for appellants at 27, quoting *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013).

[25] See, *Moyer v. Nebraska City Airport Auth.*, *supra* note 8; *Hansen v. County of Cass*, 185 Neb. 565, 177 N.W.2d 568 (1970).

The "fair market value" of a piece of property is the price that someone ready to sell, but not required to do so, would be willing to accept in payment for the property, and that someone ready to buy, but not required to do so, would be willing to pay for the property.

In determining fair market value, you may consider the uses to which the property has been put and the uses to which it might reasonably be put in the immediate future.

The Hikes requested that the following additional language be added to this instruction: "In determining the amount of compensation to be paid, you must not consider any change in the fair market value of the property caused by the public improvement or by the knowledge that the improvement would be constructed or that the access would be taken." The district court refused to include this language in the instruction.

The instruction given was taken from NJI2d Civ. 13.02, and the additional language requested by the Hikes is an optional portion under the pattern instruction. The comment to NJI2d Civ. 13.02 states: "Use only those parts of this pattern instruction as are appropriate under the pleadings and the evidence." It further states that the provision requested by the Hikes is to be used

when there is a danger that the jury will conclude that, as a result of either the public improvement for which the property was acquired or the likelihood that the property would be acquired for such improvement, the value of the property increased or decreased immediately before the date of the taking.

On appeal, the Hikes assert that the additional paragraph of the instruction should have been given so that the jury was not misled by the evidence that NDOR intended to take the access point as early as 1998. The Hikes contend in their brief that "NDOR argued repeatedly that the Property could never be commercial because NDOR previously intended to acquire the access and would deny any request for the return of that access by the Hikes *because* Highway 75 was 'already planned

to be a freeway.'"[26] They also contend that NDOR took the position that it "had acquired the critical access needed to develop the Property commercially before the taking was instituted. This happened to be the very same access that NDOR acquired through the filing of the condemnation petition on May 2, 2008."[27]

But what NDOR actually argued was that the property could never be adapted to commercial use as it existed with the 30-foot access without acquiring more access from NDOR and that it would have denied any request for additional access because it planned to make Highway 75 a freeway. Contrary to the Hikes' contention, NDOR did not argue that at all times, it owned all access to Highway 75.

As we have noted, the fact that NDOR owned all access to Highway 75 other than that involved in the taking, and would not have been willing to sell additional access to the Hikes, was relevant to the disputed issue of whether, prior to the taking, the Hikes' property was adaptable to commercial development. These facts are distinguishable from those in *Mobeco Indus. v. City of Omaha*,[28] a case relied upon by the Hikes, in which we determined that the failure of the trial court to give the portion of NJI2d Civ. 13.02 at issue here was reversible error. In *Mobeco Indus.*, the City of Omaha condemned seven urban lots. By the time of trial on the issue of damages caused by the taking, the lots had already been partially improved. The court allowed the jury to view the property without instructing it to disregard any value added by the improvements. On appeal, we found this was error, because without an instruction to the contrary, the jury could have taken the improvements into account in determining the value of the property.

Here, no actual improvements were seen by the jury. And the evidence about NDOR's intent to construct the project was related only to the reasonableness of future commercial

---

[26] Brief for appellants at 15-16 (emphasis in original).

[27] *Id.* at 14-15.

[28] *Mobeco Indus. v. City of Omaha*, 257 Neb. 365, 598 N.W.2d 445 (1999).

development as of the date of the taking. We conclude that the district court did not err in refusing to include the optional portion of NJI2d Civ. 13.02 requested by the Hikes.

### (b) Compensability and Damages

The Hikes contend that the district court erred by failing to instruct the jury that the elimination of their easement access to Highway 75 was compensable. The issues, burden of proof, and elements of the Hikes' compensation are set forth in instruction No. 3 given by the court, to which there was no objection. That instruction is patterned after NJI2d Civ. 13.01, and its use was in conformity with the general rule that whenever applicable, the Nebraska Jury Instructions are to be used.[29] The instruction described the property taken by reference to an attached legal description which specifically stated that there would be "no ingress or egress over" a described control access line. The instruction further stated that the Hikes were entitled to recover:

> 1. The fair market value of the property taken at [its] highest or best use, figuring that value as [of] May 2, 2008.
>
> 2. Any decrease in the fair market val[u]e of the remaining property, to the extent that the decrease was proximately caused by the taking.
>
> 3. Reasonable value for the use of [the Hikes'] property for a temporary easement.
>
> 4. Reasonable abstracting expenses.

This instruction was a correct statement of the law and afforded a basis on which the Hikes could and did argue that they should be compensated for the loss of access to Highway 75.

The Hikes contend on appeal that the court erred in not giving NJI2d Civ. 13.06 or NJI2d Civ. 13.07. But there is no indication in the record that the Hikes ever requested that these instructions be given. And in any event, they are inapposite to

---

[29] See, *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006); *Borley Storage & Transfer Co. v. Whitted*, 271 Neb. 84, 710 N.W.2d 71 (2006).

this case because they involve the taking of a new permanent easement over a condemnee's property. In this case, the existing easement in question was extinguished.

[12] The Hikes did request four jury instructions which consisted of legal principles generally stating the nature of a permanent easement and its compensability in a condemnation action. The district court declined to give these instructions. In reviewing a claim of prejudice from instructions given or refused, an appellate court must read the instructions together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error.[30]

The requested instructions are correct statements of the law. But we conclude that the Hikes were not prejudiced by the district court's refusal to give them. The issue in this case was not the fair market value of the Highway 75 access easement standing alone, but, rather, the value of the entire condemned tract, which included the easement, and any decrease in the fair market value of the Hikes' remaining property to the extent that the decrease was proximately caused by the taking. That, in turn, depended upon whether the easement would have been sufficient to permit future commercial development of the Hikes' property had it not been taken, which was the subject of conflicting evidence at trial. The instructions given by the court adequately instructed the jury on the measure of damages.

### 3. NDOR's Closing Argument

During closing argument, counsel for NDOR discussed the parties' different interpretations regarding the highest and best use of the property prior to the taking. Counsel then stated that the Hikes had "totally and completely failed to carry [their] burden in [their] argument to you that this property was — is commercial at all, let alone, in the immediate future." Counsel continued, "I don't want to — rarely do I get worked up in a

---

[30] *Borley Storage & Transfer Co. v. Whitted, supra* note 29; *Pribil v. Koinzan,* 266 Neb. 222, 665 N.W.2d 567 (2003).

condemnation case. But, I've got to tell you, a million dollars? We're the Nebraska Department of Roads; we're not the Nebraska State Lottery." The Hikes immediately objected and moved for a mistrial. The court ordered the statement stricken, implicitly denying the motion for mistrial.

On appeal, the Hikes argue the reference to the state lottery was so inflammatory that a mistrial was warranted. They argue that the statement caused the jury to think about not just what the damages should be, but who was going to pay them. They contend a mistrial was warranted because there was no way to "'unring a bell.'"[31]

[13-15] A mistrial is appropriate when an event occurs during the course of a trial which is of such a nature that its damaging effects would prevent a fair trial.[32] Generally, a mistrial is only warranted where unfairness has been injected into a jury trial and so permeates the proceedings that no amount of admonition to the jury can remove the unfairness to a party.[33] A trial court has considerable discretion in determining when an event occurring during a trial can be rectified by a cautionary instruction or is so prejudicial as to warrant a mistrial.[34] We agree with the Hikes and the district court that the hyperbolic statement was improper. But it was an isolated event which hardly permeated the proceedings so as to prevent a fair verdict. The district court did not abuse its discretion in instructing the jury to disregard the statement and overruling the motion for mistrial.

### 4. Motion for New Trial

All of the grounds for new trial asserted by the Hikes were included in this appeal. We have found them to be without merit, and it necessarily follows that the district court did not err in overruling the motion for new trial.

---

[31] Brief for appellants at 30.

[32] *Sturzenegger v. Father Flanagan's Boys' Home, supra* note 3. See *State v. Archbold*, 217 Neb. 345, 350 N.W.2d 500 (1984).

[33] *State v. Archbold, supra* note 32.

[34] See *Sturzenegger v. Father Flanagan's Boys' Home, supra* note 3.

## V. CONCLUSION

For the reasons discussed, we affirm the judgment of the district court in all respects.

AFFIRMED.

––––––––––––––––

ConAgra Foods, Inc., appellant, v.
Ryan J. Zimmerman, appellee.
___ N.W.2d ___

Filed May 9, 2014.    No. S-13-375.

1. **Injunction: Equity: Appeal and Error.** An action for injunction sounds in equity. On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court.
2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
3. **Evidence.** Determining the relevancy of evidence is a matter entrusted to the discretion of the trial court.
4. **Trial: Evidence: Appeal and Error.** An erroneous exclusion of evidence is reversible only if the complaining litigant was prejudiced by the exclusion of such evidence.
5. **Injunction: Equity.** An injunction lies in equity.
6. **Equity.** Equity is not a rigid concept, and its principles are not applied in a vacuum.
7. ____. Equity is determined on a case-by-case basis when justice and fairness so require.
8. **Injunction.** An injunction is an extraordinary remedy, and it ordinarily should not be granted unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice.
9. **Injunction: Trespass.** An injunction against trespassing will be granted where the nature and frequency of trespasses are such as to prevent or threaten the substantial enjoyment of the rights of possession and property in land.
10. **Injunction: Proof.** The party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle him or her to relief.
11. **Criminal Law.** As a general rule, the prosecution of criminal offenses is normally a complete and sufficient remedy at law.
12. **Criminal Law: Injunction: Equity.** Where acts complained of are in violation of the criminal law, courts of equity will not, on that ground alone, interfere by