IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. LONG

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ANTHONY R. LONG, APPELLANT.

Filed October 10, 2017.    No. A-16-888.

Appeal from the District Court for Fillmore County: VICKY L. JOHNSON, Judge. Affirmed.

Lyle J. Koenig, Koenig Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and Sarah E. Marfisi for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

After a bench trial in the district court for Fillmore County, Anthony R. Long was convicted of intentional child abuse resulting in serious bodily injury and intentional child abuse resulting in death. He appeals from his convictions, asserting that there was insufficient evidence to support the convictions and that the district court erred in denying his request to appoint an expert on false confessions. We affirm.

## II. BACKGROUND

Long was charged with intentional child abuse resulting in serious bodily injury and intentional child abuse resulting in death following the death of his 5-week-old son, Grayson Long. At the time of Grayson's death, Long lived with his fiance, Nicole Craig (Nicole), and Grayson in

an apartment in Geneva, Nebraska. Nicole was Grayson's mother. Grayson was Long's and Nicole's first child.

Grayson was born on April 26, 2014. Although Nicole was in labor for about 30 hours, the doctor who delivered Grayson, Dr. Jason Bespalec, described Grayson's birth as "completely normal." Nicole pushed for approximately an hour or an hour and a half before delivering Grayson vaginally. No devices were used to assist in delivering Grayson. There was meconium present in the amniotic fluid, which increased the risk that Grayson would develop an infection, but Dr. Bespalec administered antibiotics to Grayson and he did not develop any infection.

When Grayson was born, he weighed nine pounds, five ounces. Dr. Bespalec's examination of Grayson immediately after his birth indicated that Grayson was "perfectly normal." Grayson remained in the hospital for only 24 hours after his birth. In the days following Grayson's birth, he was alert and was eating well. Nicole breastfed Grayson, but also introduced Grayson to bottle feeding when he was approximately a week old. Grayson's initial "well- checks" with Dr. Bespalec revealed that Grayson was doing well and was gaining weight.

When Grayson was about three weeks old, Nicole noticed slight changes in Grayson. Grayson was "fussier" than he had previously been. He cried more often and was more difficult to console. In addition, he started to struggle with breastfeeding. He was no longer able to properly "latch on" and obtain breast milk. At about this same time, Nicole observed that Grayson had two small bruises on his forehead and a "blood spot in one of the corners of his eyes." On May 23, 2014, when Grayson was about four weeks old, Nicole took Grayson to Dr. Bespalec's office because of his problems with breastfeeding and because he was crying more than usual. In addition, Nicole believed that Grayson had an elevated temperature. After a physician's assistant at Dr. Bespalec's office examined Grayson, it was believed that Grayson may have been suffering from a "viral upper respiratory infection."

On May 29, 2014 about one week after Grayson's visit to Dr. Bespalec's office, Nicole left Grayson with Long while she went to have the oil changed in her car. She was gone for about two hours. When she left, Grayson was sleeping. When she returned, he was still sleeping. Nicole described Grayson as being "very good" on that day. The next day, on May 30, Grayson was again "very good." He was calm and he ate "better than most" days. That evening, Nicole took Grayson to a friend's house for a gathering. Grayson slept in a crib while at the gathering. No one but Nicole had any contact with him.

On May 31, 2014, Nicole and Long were preparing to move out of their apartment and into her parents' house. Grayson woke from a nap just prior to 11:00 in the morning. Because Nicole had to run an errand, she asked Long to feed Grayson. Nicole prepared a bottle for Grayson and gave Long instructions on how to feed him. Nicole had been gone for about 15 or 20 minutes when she received a telephone call from Long. At the time of this call, Nicole was just pulling back into the parking lot of the apartment complex. Long told her that Grayson was not moving. Nicole ran into the apartment and grabbed Grayson from Long. At this time, Grayson was limp and was a bluish color. Nicole immediately called 911. While she was on the telephone, her brother and her father arrived in order to help with the move. Nicole and her brother ultimately drove Grayson the short distance to the local hospital.

When Grayson arrived at the emergency room, he was evaluated by Dr. Bespalec. Grayson was not breathing and had no reaction to painful stimuli. Dr. Bespalec intubated Grayson in order to help him breathe. While intubating him, Dr. Bespalec observed Grayson to have mucous in his nose and throat. Dr. Bespalec then prepared Grayson to be transferred to Children's Hospital in Omaha, Nebraska.

When Grayson arrived at Children's Hospital, he "was profoundly ill." He was suffering from a significant brain injury. He had a subdural hematoma (bleeding between his brain and his skull) and retinal bleeding. He had 16 rib fractures of different ages and he had bruises on his left eyebrow and on his chest. Over the course of treatment, no brain activity was noted by Grayson's doctors. Eventually, after consultation with the medical team, Nicole decided to remove Grayson from life support. Grayson died on June 3, 2014.

Long was interviewed by Nebraska State Patrol investigators shortly after Grayson arrived at Children's Hospital. During the course of this interview, Long indicated that after Nicole had left the apartment, he had tried to feed Grayson his bottle. However, Grayson would not take the bottle, which frustrated Long. Long stated that he sometimes got "a little too frustrated" with Grayson, especially when he would cry. Long also stated that on the morning of May 31, he "got a little rough with [Grayson] . . . a little too rough with him."

Long admitted that on May 31 when Grayson refused the bottle, Long forced the bottle into Grayson's mouth and held it there until Grayson started to gag. Long then hit Grayson a few times on his head with his open hand. Long also squeezed Grayson's legs around his hips and pelvis "medium hard." While Long was squeezing him, Grayson stopped moving and stopped breathing.

Long also admitted that he had hurt Grayson prior to May 31. He told the investigators that in the last 2 or 3 weeks he had hit Grayson on the head "too many" times. He later explained that he had hit Grayson at least once or twice a week. Long admitted that he had previously thrown Grayson on the bed from a height of about a foot. He indicated that he had done this on 4 to 6 occasions. Long admitted that he had squeezed Grayson prior to May 31. Long denied ever shaking Grayson. After Long's interview with law enforcement, he was arrested.

A bench trial was held beginning on June 28, 2016, and concluding a few days later on July 1. During the trial, the State called four expert witnesses to testify regarding the cause of Grayson's injuries and his death. Each of the State's expert witnesses opined that Grayson's injuries were non-accidental and were the result of someone intentionally injuring Grayson. Long called one expert witness, who provided a conflicting opinion about the cause of Grayson's injuries and death. Long's expert opined that Grayson died as a result of undiagnosed injuries he suffered during the birthing process and a subsequently acquired infection in the brain. Because the expert testimony is the primary focus of Long's contentions on appeal, we recount such testimony in some detail.

The State's first expert witness was Dr. Terri Love, a pediatric radiologist employed by Children's Hospital. Dr. Love reviewed testing completed on Grayson after he was admitted to Children's Hospital. Dr. Love testified that Grayson's tests revealed that he had multiple areas of bleeding in his brain. Some of these areas appeared to be approximately two weeks old. Other areas of bleeding appeared more recent. These recent injuries could have happened as recently as

a few hours prior to testing, but did not occur more than a few days prior to testing. Grayson's entire brain had been deprived of oxygen. In addition, Grayson had multiple broken bones. He had healing rib fractures that were approximately two weeks old. He also had more recently fractured ribs. These fractures were less than three days old. He had fractures on his left and right legs and a fracture on his left shoulder. These injuries appeared to have occurred "very recent[ly]."

Dr. Love testified that Grayson's injuries were "highly suggestive of non-accidental trauma." Specifically, she opined that Grayson's injuries were the result of "significant" trauma such as shaking or squeezing. She testified that his injuries could have been caused by someone hitting Grayson in the head; throwing him down on a bed; or squeezing him. She also testified that Grayson's injuries were not the result of the birthing process because the injuries were too recent and were not the type of injuries sustained during birth-related trauma. In addition, she testified that Grayson did not suffer from an infection in the brain, nor did he suffer from the bone disease referred to as infantile rickets.

The State's second expert witness was Dr. Suzanne Haney, a child abuse pediatrician employed by Children's Hospital. Dr. Haney cared for Grayson after he was admitted to Children's Hospital. Dr. Haney agreed with Dr. Love's findings that Grayson suffered from subdural hematomas; multiple fractures throughout his body; and a significant brain injury caused by a lack of oxygen. In addition, Dr. Haney observed Grayson to have retinal hemorrhages in the backs of his eyes and to have bruising on his left eyebrow and on his chest.

Dr. Haney testified that Grayson died after suffering from "multiple, probably fatal injuries that were the result of abusive head trauma." In fact, Dr. Haney testified that abuse was the only possible diagnosis. She opined that sometime after Nicole left the apartment on May 31, Grayson was shaken or "slammed" or both shaken and "slammed." She also testified that Long's confession that he had hit and squeezed Grayson repeatedly was consistent with Grayson's injuries.

Dr. Haney did not believe that Grayson's injuries were the result of the birthing process or the result of any infection. In addition, she testified that Grayson did not suffer from infantile rickets. She also explained the minimal bruising that was observed on Grayson. She testified that if a child was hit with an open palm on the side or back of the head, there would not necessarily be an external bruise to mark the injury. However, she testified that even the minimal bruising observed on Grayson was "very concerning for inflicted injury" because Grayson was so young and was relatively immobile.

The State's third expert witness was Dr. Michelle Elieff, a forensic pathologist who performed an autopsy of Grayson. Dr. Elieff agreed with Dr. Love's and Dr. Haney's findings that Grayson suffered from bleeding in his brain; multiple fractures throughout his body, including on his ribs, his legs, and his left arm socket; hemorrhaging in his eyes; and a bruise near his left eye. She also observed that Grayson suffered from a bruise behind his left ear; a "shearing injury" from his brain to his spinal cord; and a hemorrhage in his optic nerve. The latter two injuries are typically caused by a "rotational impulse," like shaking a baby.

Dr. Elieff determined that Grayson's cause of death was "blunt force head injuries with cranial and spinal trauma." She testified that Grayson's fatal injuries were not accidental. Specifically, Dr. Elieff opined that the bruise on Grayson's eye could have been caused by him being hit with an open hand, that his rib fractures could have been the result of being squeezed,

and that his brain and spinal cord injuries could have been the result of being shaken. She also testified that Grayson's injuries could not have been caused by the birthing process and they were not the result of any infection or infantile rickets. Dr. Elieff agreed with Dr. Haney that Grayson would not necessarily have exhibited external bruising as a result of his internal injuries. She also agreed that any bruising would be unusual in a child of Grayson's young age.

After the State finished its case in chief, Long called Dr. Steven Gabaeff to testify on his behalf. Dr. Gabaeff is a "medical doctor practicing in clinical forensic medicine." In addition, he has previously been employed as an emergency room physician. Dr. Gabaeff reviewed Grayson's medical records from the time of his birth through his death. Dr. Gabaeff testified that he was "100 percent certain" that the bleeding in Grayson's brain was caused by an injury during the birthing process. Dr. Gabaeff noted that when Grayson was born, he had a large head which may have contributed to the brain injury. In addition, Dr. Gabaeff testified that there was "no doubt . . . in my mind" that in the weeks following Grayson's birth he developed a brain infection, viral encephalitis. He opined that this brain infection probably began as a sinus infection, which he believes explains why Nicole took Grayson to the doctor a week prior to his death.

Dr. Gabaeff went on to testify that Grayson "collapsed" on May 31, 2014, due to the infection in his brain causing increased pressure in his head. This increased pressure induced Grayson to vomit. Grayson gagged on the vomit, which caused a lack of oxygen to the brain. The lack of oxygen to the brain destroyed Grayson's brain and caused retinal hemorrhaging. Dr. Gabaeff testified that Grayson died of natural causes and not any abuse.

Dr. Gabaeff did not believe that Grayson had suffered any blunt force trauma because there was no significant external bruising. He did not believe that Grayson had been shaken by anyone because Grayson did not suffer from a significant neck injury. In addition, he did not believe that Grayson had suffered any fractures to his ribs or his extremities. Instead, Dr. Gabaeff testified that Grayson suffered from infantile rickets, due to a presumed vitamin D deficiency. Dr. Gabaeff testified that 90 percent of babies suffer from infantile rickets. He testified that he did not examine Grayson's x-rays to confirm this diagnosis.

After Dr. Gabaeff testified, the State called a rebuttal witness, Dr. James Anderst. Dr. Anderst is the division chief for the Division of Child Abuse and Neglect at Children's Mercy Hospital in Kansas City, Missouri. Dr. Anderst had reviewed Grayson's medical records from the time of his birth through his death. He disputed the testimony of Long's expert witness that Grayson had died of natural causes.

Specifically, Dr. Anderst testified that there was no indication in Grayson's medical records that Grayson had suffered from an infection in his brain. He explained that Grayson's brain did not "show all kinds of white cells and lymphocytes all over the place" like it would have if Grayson had a brain infection when he died. Dr. Anderst also testified that there was no indication that Grayson suffered from infantile rickets. He explained that while Grayson may have had a vitamin D deficiency, that not every person with a vitamin D deficiency suffers from rickets. He also explained that Grayson's x-rays clearly demonstrated that Grayson had multiple fractures. The x-rays did not show that Grayson exhibited any of the characteristics of rickets. Dr. Anderst testified that Grayson did not die due to injuries he suffered at birth. He explained that Grayson may have had a subdural hematoma at birth. However, any such injury was not the cause of

Grayson's death. Dr. Anderst stated, "birth subdurals . . . don't kill you. You don't suddenly go from well to dead five weeks later due to a birth subdural."

Dr. Anderst testified that Grayson's autopsy revealed that he had suffered a "diffuse, traumatic axonal injury" in his brain. He also reiterated the testimony of the State's other expert witnesses that a child with Grayson's injuries would not necessarily have any external bruising.

Immediately after the conclusion of the evidence, the district court announced its verdict from the bench. The court stated that it found the State's expert witnesses to be credible and that it found the defense's expert to not be credible. The court stated that the evidence proved that Grayson "died of an acute, traumatic event." The court then found, beyond a reasonable doubt, that Long was guilty of intentional child abuse resulting in death and intentional child abuse resulting in serious bodily injury.

Subsequently, the district court sentenced Long to 50 to 60 years' imprisonment on his conviction for intentional child abuse resulting in death and to 10 to 20 years' imprisonment on his conviction for intentional child abuse resulting in serious bodily injury. The court ordered the sentences to run consecutively to each other.

Long appeals his convictions.

## III. ASSIGNMENTS OF ERROR

On appeal, Long asserts that there was insufficient evidence to support both his conviction for intentional child abuse resulting in death and his conviction for intentional child abuse resulting in serious bodily injury. In addition, he asserts that the district court erred in refusing to appoint an expert on false confessions to testify for the defense.

## IV. STANDARD OF REVIEW

An appellate court will uphold a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. In making this determination, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. See *State v. Schuller*, 287 Neb. 500, 843 N.W.2d 626 (2014). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

On appeal, Long argues that there was insufficient evidence to support his conviction for intentional child abuse resulting in death and his conviction for intentional child abuse resulting in serious bodily injury. We address the evidence presented in support of each of these convictions and Long's assertions about each conviction separately below. Ultimately, we conclude that Long's assertions on appeal have no merit. There was sufficient evidence presented to support Long's convictions.

(a) Intentional Child Abuse Resulting in Death

Long was convicted of intentional child abuse resulting in death, a Class IB felony under Neb. Rev. Stat. § 28-707(8) (Cum. Supp. 2014). Under § 28-707(1), a person is guilty of child abuse "if he or she knowingly, intentionally, or negligently causes or permits a minor child to be . . . [p]laced in a situation that endangers his or her life or physical or mental health; [c]ruelly confined or cruelly punished; [or d]eprived of necessary food, clothing, shelter, or care." Section 28-707(8) provides that child abuse is a Class IB felony "if the offense is committed knowingly and intelligently and results in the death of such child." In this case, the State charged in the information that Long committed the offense knowingly and intentionally and that the offense resulted in Grayson's death.

When we view the evidence presented at trial in the light most favorable to the prosecution, we conclude that there was sufficient evidence to convict Long of intentional child abuse resulting in death. The evidence revealed that at the time Grayson stopped moving and stopped breathing, Long was alone with him. In the days and hours leading up to Grayson being taken to the emergency room with these symptoms, he was a little fussier than normal, but otherwise was doing fine. He was alert and he was eating well.

Long admitted to law enforcement that after Nicole left the apartment on May 31, he had gotten frustrated with Grayson because Grayson would not take his bottle. Long held the bottle in Grayson's mouth until he gagged. Long hit Grayson repeatedly in the head. Long squeezed Grayson until he stopped moving and stopped breathing. The State's expert witnesses agreed that Long's actions were the cause of Grayson's injuries and ultimate death. Specifically, the testimony of the State's experts revealed that Grayson died of abusive head trauma which had been intentionally inflicted. The State's experts also opined that Grayson's fatal injuries could have been caused by someone hitting Grayson in the head with an open palm or by someone slamming or throwing him onto a bed.

When we consider the evidence that Long was alone with Grayson when he suffered his fatal injuries together with Long's confession to law enforcement and the testimony of the State's expert witnesses, we conclude that there was sufficient evidence to support Long's conviction for intentional child abuse resulting in death. However, on appeal, Long contends that all of the evidence presented by the State was insufficient to convict Long of intentional child abuse resulting in death because of the conflicting testimony provided by his expert witness. Long asserts that because the trial court was presented with two legitimate medical theories about Grayson's cause of death, reasonable doubt about Long's guilt existed. Essentially, Long asserts that the trial court was not qualified to choose between the two medical theories offered at trial. We find no merit to Long's assertion.

The trial court, as the finder of fact in a bench trial, has the authority to determine the credibility of the witnesses. *State v. Thompson*, 278 Neb. 320, 770 N.W.2d 598 (2009) (stating that determinations of witness credibility "are within a fact finder's province for disposition"). This authority extends to the court's determination of the credibility of expert witnesses. In fact, the Supreme Court has held that where opinion evidence of experts is in conflict, the resolution of the conflict becomes a question for the fact finder. See *Carlson v. Okerstrom*, 267 Neb. 397, 675

N.W.2d 89 (2004). In this case, the trial court explicitly found that the State's expert witnesses were credible and Long's expert witness was not credible. As we explained above, given that the trial court directly observed and heard these witnesses, we do not question the court's determination of witness credibility. See *State v. Schuller, supra*.

The evidence presented at trial was sufficient to support Long's conviction for intentional child abuse resulting in death.

(b) Intentional Child Abuse Resulting in Serious Bodily Injury

Long was also convicted of intentional child abuse resulting in serious bodily injury, a Class II felony under Neb. Rev. Stat. § 28-707(7). Under § 28-707(1), a person is guilty of child abuse "if he or she knowingly, intentionally, or negligently causes or permits a minor child to be . . . [p]laced in a situation that endangers his or her life or physical or mental health; [c]ruelly confined or cruelly punished; [or d]eprived of necessary food, clothing, shelter, or care." Section 28-707(7) provides that child abuse is a Class II felony "if the offense is committed knowingly and intelligently and results in serious bodily injury." Serious bodily injury is defined in Neb. Rev. Stat. § 28-109(20) (Reissue 2008) as "bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body." In this case, the State charged in the information that Long committed the offense knowingly and intentionally and that the offense resulted in serious bodily injury to Grayson.

When we view the evidence presented at trial in the light most favorable to the prosecution, we conclude that there was sufficient evidence to convict Long of intentional child abuse resulting in serious bodily injury. The evidence presented at trial revealed that in addition to the injuries Grayson suffered on May 31, 2014, which proved fatal, at the time of his death, he was also suffering from serious injuries that were approximately two to three weeks old. These injuries included bleeding in his brain and multiple fractures to his ribs.

Long confessed to law enforcement that in the two to three weeks leading up to Grayson's death, he had repeatedly struck Grayson; thrown Grayson on the bed; and squeezed Grayson. Specifically, Long told law enforcement that he had hit Grayson with an open hand at least once or twice a week prior to May 31. Long admitted that he had previously thrown Grayson on the bed from a height of about a foot. He indicated that he had done this on 4 to 6 occasions. Long admitted that Grayson's crying aggravated him and caused him to become aggressive and violent with Grayson on multiple occasions prior to May 31.

The State's expert witnesses testified that the bleeding in Grayson's brain could have been caused by someone hitting him in the head with an open hand or by someone "slamming" him. In addition, the experts agreed that Grayson's healing rib fractures were consistent with someone squeezing him very tightly.

On appeal, Long challenges the evidence presented by the State when he alleges that there was simply no evidence presented that Long was alone with Grayson or had injured him at any time prior to May 31, 2014. Long's assertion has no merit. The State presented evidence that Long was alone with Grayson for at least short periods of time in the days and weeks leading up to Grayson's death. The State presented evidence that Nicole left Grayson alone with Long when she

left the apartment to go on brief errands. In addition, Nicole testified that Long was often alone in the apartment with Grayson for a little while each morning while she went outside to smoke a cigarette and to talk with her mother on the telephone. Moreover, as we reiterated above, Long confessed to repeatedly hurting Grayson in the days and weeks leading up to May 31. Long told law enforcement that Grayson's crying aggravated him and caused him to become violent and aggressive with Grayson.

When we consider the evidence of Long's confession to law enforcement about his chronic abuse of Grayson together with the testimony of the State's expert witnesses, we conclude that there was sufficient evidence to support Long's conviction for intentional child abuse resulting in serious bodily injury.

## 2. FAILURE TO APPOINT EXPERT IN FALSE CONFESSIONS

In his brief on appeal, Long contends that the district court erred in "refusing" to appoint an expert witness on false confessions to assist in his defense. Upon our review of the record, we conclude that Long's contention lacks merit. The record simply does not support his assertion that the district court "refused" any request to appoint an expert witness on false confessions.

Prior to trial, Long filed a motion requesting that the district court appoint certain expert witnesses to assist in his defense. As a part of this request, Long asked the court for "the ability to engage the services of Dr. Richard Ofshe," who was described as "a world renown expert on the subject of false confessions." Dr. Ofshe lives and works in San Francisco, California. Long indicated that he wanted Dr. Ofshe to review his confession and provide an opinion about the validity of the confession. Long requested that he be provided $2,000 to engage the services of Dr. Ofshe. In support of this request, Long's counsel told the court simply, "In these types of cases, false confessions are frequently made."

The State objected to Long's request. Specifically, the State indicated that Long had not indicated the necessity of such an expert. The State argued that "a vigorous cross-examination of the State's witnesses" regarding the confession would negate the need for any expert testimony.

After the State objected, Long's counsel indicated to the court that another expert, a Dr. Wilson who "used to be the head of the psychiatry department at Creighton University," could also provide an opinion about Long's confession. In fact, counsel told the court, "I personally would rather have [Dr. Wilson] than Dr. Ofshe." Counsel also indicated, however, that he had not spoken to Dr. Wilson about this case.

After Long's counsel indicated his preference to employ Dr. Wilson, the following colloquy occurred between the trial court and counsel:

> THE COURT: Well, that makes my decision a little easier. I won't approve Dr. Ofshe. I don't have any information on Dr. Wilson.
>
> [DEFENSE COUNSEL]: Let me - I can get that for you. I can supply that to you by e-mail and counsel at the same time with a request.
>
> THE COURT: I am not saying that I am going to approve it.
>
> [DEFENSE COUNSEL]: I understand that.

[THE COURT]: I am just saying that I don't think I have enough information right now to make that decision.

[DEFENSE COUNSEL]: All right. Fine.

Long's counsel never supplied any further information to the court about Dr. Wilson, nor did he ever make a formal motion asking the court to appoint Dr. Wilson as an expert witness on false confessions. In fact, in his brief on appeal, Long concedes that he "was unable to retain Dr. Wilson and no further information was presented to the court with respect to him." Brief for appellant at 25.

While, on appeal, Long contends that the trial court "refused" to appoint an expert witness on false confessions, our reading of the record refutes Long's characterization of the relevant facts. Our review reveals that Long actually withdrew his request for the court to appoint Dr. Ofshe because Long's counsel preferred to have Dr. Wilson appointed. Accordingly, even though the court indicated that it was denying Long's request to appoint Dr. Ofshe, such statement was clearly in response to Long's withdrawal of the request. Additionally, counsel never provided the court any information about Dr. Wilson, nor did counsel ever make any formal request to have him appointed as an expert in the case. As such, he did not ever sufficiently present this issue to the trial court for its review.

Ultimately, we do not find anything in the record to support Long's statement that the court "refused" his request to appoint an expert on false confessions. Instead, we conclude that because Long withdrew his initial request and never made any further request, this issue was not properly presented to or passed upon by the trial court. And, as we have often stated, an appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. See *Erin W. v. Charissa W.*, 297 Neb. 143, 897 N.W.2d 858 (2017). This is because the trial court cannot commit error in resolving an issue never presented and submitted to it for disposition. *Id*. Long's assertion has no merit.

## VI. CONCLUSION

We conclude that the evidence in this case was sufficient to support Long's conviction for intentional child abuse resulting in death and his conviction for intentional child abuse resulting in serious bodily injury. In addition, we reject Long's claim that the district court refused to appoint an expert in false confessions. Accordingly, we affirm Long's convictions.

AFFIRMED.